MOSKOVITZ, EXR., ET AL., APPELLANTS, *v.* MT. SINAI MEDICAL CENTER ET AL.; FIGGIE ET AL., APPELLEES.

[Cite as *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638.]

(No. 93–278—Submitted March 2, 1994—Decided July 27, 1994.)

644

646

*Charles Kampinski Co., L.P.A., Charles Kampinski, Christopher M. Mellino* and *Donna Taylor–Kolis,* for appellants.

*Fritz Byers; Jacobson, Maynard, Tuschman & Kalur Co., L.P.A., John V. Jackson II, Robert Seibel* and *Steven Hupp,* for appellee.

*Steven S. Zaleznik, Michael R. Schuster* and *Bruce B. Vignery; Patton, Boggs & Blow* and *Steven M. Schneebaum,* urging reversal for *amicus curiae,* American Association of Retired Persons.

*Jeffrey R. White,* urging reversal for *amicus curiae,* Association of Trial Lawyers of America.

*Nurenberg, Plevin, Heller & McCarthy Co., L.P.A., Andrew P. Krembs* and *Kathleen J. St. John,* urging reversal for *amicus curiae,* Ohio Academy of Trial Lawyers.

---

DOUGLAS, J. This appeal presents four issues for our consideration. Were punitive damages, and the amount awarded, appropriate and proper on the facts of this case? Were the compensatory damages awarded for the survival action and for wrongful death excessive? Should prejudgment interest have been allowed? Was it proper to sanction appellant's attorney under Civ.R. 11? Figgie has not appealed and, thus, the finding that Figgie was negligent in his care and treatment of Moskovitz is not at issue.

## I

### Punitive Damages

The jury's award of punitive damages was based upon Figgie's alteration, falsification or destruction of medical records. The punitive damages were awarded in connection with the survival action. The court of appeals' majority vacated the award of punitive damages for two reasons. First, the court of appeals' majority determined that punitive damages were not available under the circumstances of this case, since Figgie's act of altering and destroying records did not directly cause actual harm to appellant—*i.e.,* records disappeared and were altered after the diagnosis of terminal illness and the alteration and disappearance of the records did not adversely affect appellant's claims. Second, the court of appeals' majority found that appellant failed to establish a right to punitive damages under the standards set forth in *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. We disagree.

The court of appeals held that for punitive damages to be awarded, appellant was required to prove "a harm distinct from the medical negligence claim and attributable solely to the alleged alteration of medical records." To support this conclusion, the court of appeals relied upon *Shimola v. Nationwide Ins. Co.* (1986), 25 Ohio St.3d 84, 25 OBR 136, 495 N.E.2d 391; *Bishop v. Grdina* (1985), 20 Ohio St.3d 26, 20 OBR 213, 485 N.E.2d 704; and *Rouse v. Riverside Methodist Hosp.* (1983), 9 Ohio App.3d 206, 9 OBR 355, 459 N.E.2d 593. However, nothing in these cases suggests that the malicious intent necessary to sustain an award of punitive damages must itself proximately result in some compensable harm.

*Shimola* and *Bishop, supra,* stand for the age-old proposition that proof of actual damages in an underlying cause of action is a necessary predicate for an award of punitive damages. See, also, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273, and *Richard v. Hunter* (1949), 151

Ohio St. 185, 39 O.O. 24, 85 N.E.2d 109. In Ohio, no civil action may be maintained simply for punitive damages. *Bishop, supra,* 20 Ohio St.3d at 28, 20 OBR at 214, 485 N.E.2d at 705. Rather, punitive damages are awarded as a mere incident of the cause of action in which they are sought. *Id.* Thus, compensable harm stemming from a cognizable cause of action must be shown to exist before punitive damages can be considered.

*Bishop* was a case involving an award of punitive damages where no compensatory damages were awarded on the underlying cause of action. In *Bishop,* we held that proof of actual damages on the underlying claim is a necessary predicate for an award of punitive damages. *Id.* at 28, 20 OBR at 214, 485 N.E.2d at 705. In so holding, we relied upon *Richard, supra,* which also involved a situation where punitive damages were found to be improper in the absence of an award of compensatory damages on an underlying claim. The court of appeals in the case at bar seized upon the statement in *Bishop* that "[p]unitive damages are awarded as punishment for *causing compensable* harm and as a deterrent against similar action in the future." (Emphasis added.) *Id.* at 28, 20 OBR at 214, 485 N.E.2d at 705. However, that statement in *Bishop* does not require the conclusion that malicious conduct giving rise to punitive damages must produce some compensable harm. Again, the matter at issue in *Bishop* was whether an award of punitive damages is legally supportable where no actual harm is shown in the underlying cause of action.

In *Shimola, supra,* 25 Ohio St.3d 84, 25 OBR 136, 495 N.E.2d 391, an insured sued his insurer for the tort of bad faith. The insured sought an award of punitive damages in connection with that claim. The jury awarded no actual damages on the claim, but awarded the insured $160,000 in punitive damages. We held that the award of punitive damages could not be sustained absent proof of actual damages *stemming from the underlying claim for bad faith. Id.* at 86, 25 OBR at 138, 495 N.E.2d at 393. *Shimola* clearly does not support the conclusion reached by the court of appeals' majority.

Here, appellant was awarded compensatory damages in the survival claim for Figgie's medical malpractice and that award formed the necessary foundation for the award of punitive damages. Figgie suggests that his alteration of medical records constitutes a separate claim requiring proof of actual damages, that no actual damages were shown to flow from the alteration, and that punitive damages were therefore improper. In this regard, we have recently held that "[a] cause of action exists in tort for interference with or destruction of evidence * * *." *Smith v. Howard Johnson Co., Inc.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037, 1038. However, nothing in *Smith* can be interpreted to say that a separate cause of action for spoliation of evidence is the only way such conduct can be addressed and remedied. We expressly reject any such notion. If

appellant were constrained to bring a separate cause of action for spoliation of evidence, that claim would inevitably fail, since there is no damage flowing directly from the alteration of records. Therefore, no punitive damages could be awarded to punish the unlawful conduct. Thus, if Figgie's argument is taken to its logical conclusion, litigants and prospective litigants could alter and destroy documents with impunity so long as no actual damage was caused thereby. Of course, if the damning evidence were destroyed without trace, no liability would attach *on any claim*, since no evidence would remain to implicate the spoliator. In our judgment, Figgie's alteration of records was inextricably intertwined with the claims advanced by appellant for medical malpractice, and the award of compensatory damages on the survival claim formed the necessary predicate for the award of punitive damages based upon the alteration of medical records.

The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct. See, *e.g.*, *Preston, supra*, 32 Ohio St.3d at 335, 512 N.E.2d at 1176; *Detling v. Chockley* (1982), 70 Ohio St.2d 134, 136, 24 O.O.3d 239, 240, 436 N.E.2d 208, 209; and *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419. See, also, *Bishop* and *Richard, supra.* Therefore, it would make no sense for this court to establish a rule requiring that malicious conduct giving rise to a claim for punitive damages must independently cause compensable harm before punitive damages may be awarded. If the act of altering and destroying records to avoid liability is to be tolerated in our society, we can think of no better way to encourage it than to hold that punitive damages are not available in this case. We believe that such conduct is particularly deserving of punishment in the form of punitive damages and that a civilized society governed by rules of law can require no less. Figgie's conduct of altering records should not go unpunished. We should warn others to refrain from similar conduct and an award of punitive damages will do just that.

We recognize that certain language in *Rouse, supra*, 9 Ohio App.3d at 208–209, 9 OBR at 358, 459 N.E.2d at 597, lends some support to Figgie's and the court of appeals' position that later concealment or destruction of evidence of negligence cannot render an act of negligence malicious and, thus, punitive damages are unavailable in such a case absent proof of actual harm stemming from the concealment or destruction. However, we are more persuaded by the case of *Spadafore v. Blue Shield* (1985), 21 Ohio App.3d 201, 21 OBR 215, 486 N.E.2d 1201. In *Spadafore,* Judge Moyer (now Chief Justice Moyer) concurred in the following statement of the law concerning punitive damages and the alteration of documents:

"[T]here was some additional evidence, although not substantial, of possible intentional alteration of documents. Such conduct is the type of intentional and deceptive behavior more indicative of actual malice. If such evidence is believed,

the jury could award punitive damages. With the proper caution exercised in instructing the jury as to when punitive damages are proper, the issue of punitive damages should have been submitted to the jury." *Id.* at 204–205, 21 OBR at 218, 486 N.E.2d at 1205.

Moreover, in *Calmes, supra,* 61 Ohio St.3d at 473, 575 N.E.2d at 419, this court stated that "[p]unitive damages in this state *are available upon a finding of actual malice."* (Emphasis added.) The term "actual malice" has been defined in the case of *Preston, supra,* 32 Ohio St.3d 334, 512 N.E.2d 1174, and the definition does not include an element of actual harm. In *Preston,* syllabus, we held that:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic.*)

Figgie's alteration of records exhibited a total disregard for the law and the rights of Mrs. Moskovitz and her family. Had the copy of page seven of Figgie's office chart not been recovered from the radiation department records at University Hospitals, appellant would have been substantially less likely to succeed in this case. The copy of the chart and other records produced by Figgie would have tended to exculpate Figgie for his medical negligence while placing the blame for his failures on Moskovitz. We find that the evidence adduced at trial fully supported an award of punitive damages under the standards set forth in the *Preston* syllabus.

The court of appeals' majority also determined that there was no evidence that Figgie altered or destroyed records to conceal his medical negligence. However, upon a thorough review of the record, we are convinced that the jury was presented with sufficient evidence which, if believed, supported the inference that records were altered, destroyed or concealed by Figgie in an effort to conceal his medical negligence. A unanimous panel of "arbitrators" determined that records were altered with bad motive, and that Figgie was the responsible party. Further, having awarded punitive damages, the jury, which heard the evidence and observed the demeanor of the witnesses, apparently, also so found. A competent and respected trial judge upheld the award of punitive damages and denied a motion for a new trial. With all due respect to the court of appeals' majority, we believe that the appellate court simply substituted its judgment for that of the jury and, thereby, invaded the province of the finder of fact. Further, as we stated in *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742, 745, "we have often noted in the past, where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such

findings and conclusions must be given by the reviewing court." In our judgment, the court of appeals' majority erred in holding that, as a matter of law, appellant was not entitled to an award of punitive damages.

Accordingly, we reverse the judgment of the court of appeals on the issue of punitive damages. We hold that in a case involving medical malpractice where liability is determined and compensatory damages are awarded, punitive damages pled in connection with the claim for malpractice may be awarded upon a showing of "actual malice" as that term is defined in the syllabus of *Preston v. Murty, supra*. An intentional alteration, falsification or destruction of medical records by a doctor, to avoid liability for his or her medical negligence, is sufficient to show actual malice, and punitive damages may be awarded whether or not the act of altering, falsifying or destroying records directly causes compensable harm. However, we reiterate that the purpose of punitive damages is to punish and deter. The jury's reaction in awarding $3 million in punitive damages may be understandable, given its findings of Figgie's activities, but it is wrong. Punishment does not mean confiscation. Figgie's net worth (depending on who is believed) is somewhere between $2.1 million and $3 million. We find that a portion of that net worth will send the message.

In determining the appropriate amount of punitive damages to be awarded, we are guided by the perspicuous observations of Judge John W. McCormac in *Shoemaker v. Crawford* (1991), 78 Ohio App.3d 53, 603 N.E.2d 1114. In ordering a remittitur in *Shoemaker* for an award of compensatory damages found to be excessive, Judge McCormac stated:

"Determining the amount of damages which is the maximum for adequate compensation is not an easy task. No simple mathematical formula can be applied as to either a minimum or a maximum, and there is a wide range between those figures. The decision rests as much on policy considerations as it does anything else and some degree of arbitrariness cannot be totally divorced from the decision, whether made by us or by the jury." *Id.* at 66, 603 N.E.2d at 1121–1122.

Much the same can be said in the case at bar with regard to a determination of the appropriate amount of punitive damages. Upon a review of the record, we find that $1 million in punitive damages is the appropriate amount to be awarded. Therefore, with respect to the jury's verdict for $3 million in punitive damages, we order a remittitur of $2 million.[6] Upon remand, appellant may elect to accept

---

6. Since *Shaffer v. Maier* (1994), 68 Ohio St.3d 416, 627 N.E.2d 986, questions have arisen concerning the authority of an appellate court to order a remittitur. Where a verdict is found to be excessive but not the result of passion or prejudice, an appellate court may order a remittitur with the consent of the prevailing party. In *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraphs five and six of the syllabus, this court held that:

the remittitur, in which case the trial court shall enter judgment in appellant's favor for $1 million in punitive damages. Conversely, appellant may elect to refuse the remittitur, in which case a new trial should be conducted only on the issue of punitive damages. A jury,[7] if one is impanelled for this purpose, shall be instructed that punitive damages in some amount must be awarded and that the jury's determination is to be based upon the evidence presented to them which, we fully recognize, might require a re-presentation of much of the underlying case.

## II

### Compensatory Damages

The court of appeals' majority found that the award of compensatory damages for the survival action and wrongful death was excessive and that the jury's award was influenced by passion and prejudice. Accordingly, the court of appeals' majority vacated the award and remanded for a new trial only on the issue of compensatory damages. We find that the court of appeals erred in this regard.

### A. Survival Action Award

With respect to the jury's award on the survival claim, the court of appeals' majority found that the award of $2 million was so high that it amounted to a denial of substantial justice, and that the award "was impermissibly influenced by the jury's erroneous consideration of punitive damages." In addition to finding that the jury's consideration of punitive damages was appropriate and proper, we

---

"5. The Court of Appeals has the same unlimited power and control of verdicts and judgments as the trial court and may weigh the evidence and exercise an independent judgment upon questions of excessive damages and when no passion or prejudice is apparent may modify and affirm the judgment by ordering a *remittitur* with the consent of the prevailing party.

"6. If the Court of Appeals in an error proceeding in an action for unliquidated damages finds that the verdict was rendered under the influence of passion or prejudice it has no alternative except to reverse and remand for a new trial." (Emphasis *sic.*)

In *Duracote Corp. v. Goodyear Tire & Rubber Co.* (1983), 2 Ohio St.3d 160, 162–163, 2 OBR 704, 706, 443 N.E.2d 184, 186, we reaffirmed the principles set forth in the fifth paragraph of the syllabus of *Schulte.* See, also, *Shoemaker, supra,* 78 Ohio App.3d 53, 603 N.E.2d 1114.

Civ.R. 59(A) sets forth the grounds upon which a new trial may be granted. One ground for the granting of a new trial is that the damages awarded are inadequate or excessive, appearing to have been given under the influence of passion or prejudice. Civ.R. 59(A)(4). Thus, if an award is excessive and appears to be the product of passion or prejudice, a new trial is proper and should be ordered by a reviewing court. However, where the award is found to be excessive but not the product of passion or prejudice, a remittitur may be ordered by the appellate court with the consent of the prevailing party. See *Schulte, Duracote* and *Shoemaker, supra.*

7. We make no determination as to the applicability or constitutionality of R.C. 2315.18 and 2315.21(C)(2).

also believe that the jury's consideration of punitive damages cannot form the basis for vacating the award of compensatory damages.

In Ohio, it has long been held that the assessment of damages is so thoroughly within the province of the jury that a reviewing court is not at liberty to disturb the jury's assessment absent an affirmative finding of passion and prejudice *or* a finding that the award is manifestly excessive. See *Toledo, Columbus & Ohio River RR. Co. v. Miller* (1923), 108 Ohio St. 388, 402–403, 140 N.E. 617, 621. In the case at bar, we make no such finding as to the *compensatory* damages awarded by the jury. The jury's $2 million award on the survival claim is not so manifestly excessive that a conclusion must be drawn therefrom that the award was the product of passion and prejudice. The bulk of the award was obviously for the pain and suffering Moskovitz experienced in the final year of her life, and the jury was undoubtedly in the best position to make the assessment of damages. The record is devoid of any evidence that the jury was wrongfully influenced in returning a large award, and the amount of the award itself is not so manifestly excessive at to have warranted the court of appeals' interference with the province of the jury. In addition, the *trial judge* was in the best position to determine whether the award on the survival claim was manifestly excessive or influenced by passion and prejudice. See, generally, *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 469, and *Larrissey v. Norwalk Truck Lines, Inc.* (1951), 155 Ohio St. 207, 219, 44 O.O. 238, 243, 98 N.E.2d 419, 426. The trial judge refused to set the verdict aside and denied the motion for a new trial. That determination is entitled to deference.

## B. Wrongful Death Award

As to the jury's $1.25 million award for wrongful death, the court of appeals' majority held that the award was manifestly excessive in light of the economic damages proven and in light of Moskovitz's frail condition prior to the onset of her terminal illness. Again, the determination of damages was a question for the jury and the court of appeals was not at liberty to substitute its judgment for that of the finder of fact. The jury heard evidence concerning a variety of damages suffered by the wrongful-death beneficiaries. Although the jury's award was large, it cannot be said with any degree of certainty that the award was excessive. While Moskovitz may have been frail prior to the onset of her illness, the dissent in the court of appeals ably noted that Moskovitz "was neither an amputee, dead, nor dying when Dr. Figgie failed to adequately diagnose and then treat the cancer." Moskovitz's family unquestionably suffered the loss of a loving wife and mother, and the jury was in a far better position than the court of appeals to determine the value of the losses suffered.

The court of appeals' majority also suggested that the jury's award for wrongful death may have been improperly influenced by certain references at

trial to Moskovitz's concentration camp experience and her survival of the Holocaust. However, we note that both appellant *and Figgie* commented and presented evidence on this matter. Moreover, upon a careful review of the entire record, we do not find that the jury's award was affected by passion and prejudice.

Based upon the foregoing, we find that the court of appeals erred in vacating the award of compensatory damages on the claims for survival and wrongful death. Therefore, on those issues, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

## III

### Prejudgment Interest

The issue of prejudgment interest has become a complex question. This case is a perfect example of the problem. Accordingly, the matter of prejudgment interest generally, and in this specific case, needs some discussion.

#### A. Prejudgment Interest at Common Law

Since the 1800s, Ohio courts have recognized a common-law right to prejudgment interest. In *Hogg v. Zanesville Canal & Mfg. Co.* (1832), 5 Ohio 410, 424, this court said, "But interest is allowed, not only on account of the loss which a creditor may be supposed to have sustained by being deprived of the use of his money, but on account of the gain made from its use by the debtor." In the last paragraph of the syllabus of *Hogg,* this court said, "In actions for torts the jury may calculate interest on the damages actually sustained and add it to their verdict."

In *Lawrence RR. Co. v. Cobb* (1878), 35 Ohio St. 94, paragraph four of the syllabus, this court said, "In awarding damages for an injury resulting from a tort, compensation in the nature of interest may be included." Further, in *Cobb,* at 98–99, the court stated that "[t]he rule of damages in such case is compensation for the injury, or, in other words, that the injured party should be made whole. And while it is true that such a claim is not one, which, under the statute, bears interest, nevertheless, if reparation for the injury is delayed for a long time by the wrong-doer, the injured party can not be made whole unless the damages awarded include compensation, in the nature of interest, for withholding the reparation which ought to have been promptly made."

In *Clevenger v. Westfield Co.* (1978), 60 Ohio App.2d 1, 14 O.O.3d 3, 395 N.E.2d 377, paragraph two of the syllabus, the court said that "[t]he jury may assess prejudgment interest in favor of the insured under an automobile collision insurance policy where the insurer does not make a reasonable offer of settlement on or before the date the loss is due and payable." While, admittedly, that

court was dealing with a predecessor version of R.C. 1343.03, it also discussed possible recovery of interest under common-law principles. The allowance of prejudgment interest by the *Hogg* and *Cobb* courts without a specific statutory provision and the discussion of the common-law right to interest by the *Clevenger* court confirm that prejudgment interest was known at common law.

Having established that prejudgment interest was known at common law in Ohio, we now move to correct our statement in *Bell v. Mt. Sinai Med. Ctr.* (1993), 67 Ohio St.3d 60, 63, 616 N.E.2d 181, 183, that "[a]ppellants correctly observe that an action for prejudgment interest pursuant to R.C. 1343.03(C) constitutes a special proceeding inasmuch as the right to obtain such relief is purely statutory in nature and was unavailable at common law." This statement was incorrect and the cases cited as authority for the proposition do not support it. Prejudgment interest *was* known at common law and, consequently, an action seeking prejudgment interest does *not* constitute a special proceeding. See *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 616 N.E.2d 213, syllabus, where we said that "[o]rders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02." See, also, *Dayton Women's Health Ctr. v. Enix* (1990), 52 Ohio St.3d 67, 74, 555 N.E.2d 956, 962 (Douglas, J., dissenting). Accordingly, we modify *Bell* to correct our previous error.

### B. The Statute—R.C. 1343.03(C)—Purpose

In 1982, Representative (now Judge, Tenth District Court of Appeals) Dana Deshler, Jr., introduced and sponsored Am.Sub.H.B. No. 189, 139 Ohio Laws, Part I, 2034. Eventually passed by the General Assembly and signed into law by the Governor, the bill enacted R.C. 1343.03(C), which permits an injured party, in certain circumstances, to recover interest in a tort action from the date the cause of action accrues. Thus, Ohio has created a statutory right to prejudgment interest.

R.C. 1343.03(C) reads:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

In *Peyko v. Frederick* (1986), 25 Ohio St.3d 164, 167, 25 OBR 207, 209, 495 N.E.2d 918, 921, we said that "[t]he purpose of R.C. 1343.03(C) is to encourage

litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy." In *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 202, 495 N.E.2d 572, 574, this court said that "[t]he statute was enacted to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting."

Thus, the purpose of the statute is clear. What are the components of the statute?

### C. Components of the Statute

The statute sets forth certain requirements. First, a party seeking interest must petition the court. The decision is one for the court—not any longer a jury. The motion must be filed after judgment and in no event later than fourteen days after entry of judgment. *Cotterman v. Cleveland Elec. Illum. Co.* (1987), 34 Ohio St.3d 48, 517 N.E.2d 536, paragraph one of the syllabus. Second, the trial court must hold a hearing on the motion. Third, to award prejudgment interest, the court must find that the party required to pay the judgment failed to make a good faith effort to settle and, fourth, the court must find that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case. R.C. 1343.03(C).

The statute uses the word "shall." Therefore, if a party meets the four requirements of the statute, the decision to allow or not allow prejudgment interest is not discretionary. What is discretionary with the trial court is the determination of lack of good faith. Since the crux of the statute is "good faith effort" and the ultimate decision whether to award prejudgment interest is reposed in the trial judge and, further, since the standard of review on appeal is abuse of discretion, *Ziegler v. Wendel Poultry Serv., Inc.* (1993), 67 Ohio St.3d 10, 20, 615 N.E.2d 1022, 1032, the obvious question becomes what is a "good faith effort" or, conversely, when has a party "failed to make a good faith effort to settle"?

### D. Good Faith Effort

R.C. 1343.03(C) clearly requires the development of a judicial standard of good faith. In this court's recent case on the question, *Kalain, supra,* 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, at the syllabus, we said that:

"A party has not 'failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good

faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer."

While the last sentence in this syllabus has caused some difficulty we, nevertheless, reaffirm our holding with the caveat that the last sentence of the syllabus should be strictly construed so as to carry out the purposes of R.C. 1343.03(C).

The effect of *Kalain* is to place the burden of proof on a party seeking prejudgment interest. This is, to a degree, unfortunate since much of the information needed to make a case for prejudgment interest is in the possession of the party resisting an award. Accordingly, it is incumbent on a party seeking an award to present evidence of a written (or something equally persuasive) offer to settle that was reasonable considering such factors as the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle. Other factors would include responses—or lack thereof—and a demand substantiated by facts and figures. Subjective claims of lack of good faith will generally not be sufficient. These factors, and others where appropriate, should also be considered by a trial court in making a prejudgment interest determination.

Even though the burden of a party seeking an award is heavy, the burden does not include the requirement that bad faith of the other party be shown. Lack of a good faith effort to settle should not be confused with bad faith. As we noted in *Kalain, supra,* 25 Ohio St.3d at 159, 25 OBR at 202–203, 495 N.E.2d at 574, a party may have failed to make a good faith effort to settle even though he or she did not act in bad faith. In this regard, we now move to correct a statement we made in *Villella, supra.* Therein, we stated that "a lack of good faith means more than poor judgment or negligence; rather, it imports a dishonest purpose, conscious wrongdoing or ill will in the nature of fraud." *Id.,* 45 Ohio St.3d at 42, 543 N.E.2d at 470. We now find that statement, as it relates to the lack of a good faith effort to settle, does not represent the state of the law as set forth in *Kalain.* Therefore, we now specifically modify the law stated in *Villella* by disapproving the above-quoted language. We hold that in prejudgment interest determinations pursuant to R.C. 1343.03(C), the phrase "failed to make a good faith effort to settle" does not mean the same as "bad faith."

In making this so-called good faith determination, a trial court is faced with a number of difficult issues. Two of those issues involve discovery and privilege. After a ruling on discovery has been made by the trial court, the question then arises as to the appealability of that determination.

### E. Discovery—Privilege—Appealability

Our review of the extensive transcript of the prejudgment interest hearing conducted in this case sheds some light on the difficulties facing the bench and

bar. Without question, one of the most difficult problems concerns the scope of discovery available in a proceeding for prejudgment interest.

In *Peyko, supra,* 25 Ohio St.3d 164, 25 OBR 207, 495 N.E.2d 918, paragraphs one and two of the syllabus, this court held that:

"1. When a plaintiff, having obtained a judgment against a defendant, files a motion for prejudgment interest on the amount of that judgment pursuant to R.C. 1343.03(C), the plaintiff, upon a showing of 'good cause' pursuant to Civ.R. 26(B)(3), may have access through discovery to those portions of the defendant's insurer's 'claims file' that are not shown by the defense to be privileged attorney-client communications.

"2. If the defense asserts the attorney-client privilege with regard to the contents of the 'claims file,' the trial court shall determine by *in camera* inspection which portions of the file, if any, are so privileged. The plaintiff then shall be granted access to the non-privileged portions of the file."

*Peyko* establishes that any determination regarding a party's good faith effort to settle requires a review of the settlement efforts made by a party's insurance carrier(s). *Id.* at 166–167, 25 OBR at 209, 495 N.E.2d at 921. Most of the information regarding the insurer's efforts will be contained in the claims file. In this regard, *Peyko* clearly recognizes that a post-trial proceeding for prejudgment interest is amenable to the general discovery process established by the Civil Rules. Indeed, in *Cotterman, supra,* 34 Ohio St.3d 48, 517 N.E.2d 536, paragraphs two and three of the syllabus, this court held that:

"2. The R.C. 1343.03(C) proceeding is amenable to the discovery process. The trial court should exercise such governance so as to speedily resolve the post-trial discovery.

"3. The Rules of Civil Procedure, as utilized in the general discovery process, are applicable to R.C. 1343.03(C) proceedings."

However, *Peyko* provides little guidance on the ultimate question: What is a privileged communication between an attorney and a client? We must look to the purposes of R.C. 1343.03(C), 2317.02 and Civ.R. 26 to provide the answer.

The attorney-client privilege has ancient roots. The history of the privilege can be traced back at least as far as the reign of Elizabeth I, where the privilege was already well established. See 8 Wigmore, Evidence (McNaughton Rev.1961), Section 2290. See, also, *Spitzer v. Stillings* (1924), 109 Ohio St. 297, 142 N.E. 365. In the modern law, the privilege is founded on the premise that confidences shared in the attorney-client relationship are to remain confidential. Only in this manner can there be freedom from apprehension in the client's consultation with his or her legal advisor. Wigmore, *supra,* at Section 2291. However, the privilege is not absolute. That is to say, the mere relation of attorney and client

does not raise a presumption of confidentiality of all communications made between them. *Id.* at Section 2311. Moreover, it is beyond contradiction that the privilege does not attach in a situation where the advice sought by the client and conveyed by the attorney relates to some future unlawful or fraudulent transaction. Advice sought and rendered in this regard is not worthy of protection, and the principles upon which the attorney-client privilege is founded do not dictate otherwise. See Wigmore, *supra*, at Section 2298. See, also, *Lemley v. Kaiser* (1983), 6 Ohio St.3d 258, 6 OBR 324, 452 N.E.2d 1304, wherein Judge (now Justice) Alice Robie Resnick, writing for this court, found that the attorney-client privilege exists to aid in the administration of justice and must yield in circumstances where justice so requires.

With these principles in mind, it is clear that statements, memoranda, documents, etc. generated in an attorney-client relationship tending to establish the failure of a party or an insurer to make a good faith effort to settle a case contrary to the purposes of R.C. 1343.03(C) are not protected from discovery in an R.C. 1343.03(C) proceeding for prejudgment interest. Stated otherwise, if, through the lack of a good faith effort to settle, the purposes of R.C. 1343.03(C) have been thwarted by a party and/or the attorneys involved in the case, a search for the truth of that fact cannot be hindered by claims of attorney-client privilege. Documents and other things showing the lack of a good faith effort to settle by a party or the attorneys acting on his or her behalf are wholly unworthy of the protections afforded by any claimed privilege.

As we have stated, the purpose of R.C. 1343.03(C) is to encourage good faith efforts to settle a case outside the trial setting. The focus of an R.C. 1343.03(C) post-trial hearing for prejudgment interest must be the *pretrial* settlement efforts made between the plaintiffs and defendants and/or their insurers. Often, the only way for a party to prove another party's failure to make a good faith effort to settle is by obtaining the claims file of an insurer. However, the attempt to do so is often met by defense objections to the discoverability of matters contained within the file on the basis of work product or attorney-client privilege. If access to the file or matters contained therein is denied on the basis of privilege, the hearing required under R.C. 1343.03(C) may amount to nothing less than a retrial of the entire case. The case at bar is an example of this recurrent phenomenon, although the insurer's claims file in this case was not necessary to show that Figgie and/or those acting on his behalf failed to make a good faith effort to settle the case.

The purpose of Civ.R. 26 is to provide a party with the right to discover all relevant matters, not privileged, that are pertinent to the subject of the pending proceeding. Civ.R. 26(B)(1). As indicated, in some cases, nothing is more relevant in an R.C. 1343.03(C) proceeding than the claims file of an insurer. The

file may contain memoranda or other relevant matters which establish the lack of a good faith effort to settle. At the same time, the matters contained within the file may be privileged work product or attorney-client communications, beyond the scope of discovery.

The time has come for this court to define what is and is not a privileged communication [8] in an insurer's claims file for purposes of discovery in an R.C. 1343.03(C) proceeding for prejudgment interest. In our judgment, only those attorney-client communications contained in an insurer's claims file that go directly to the theory of defense are to be excluded from discovery. To hold otherwise would be to undermine the entire purpose of a hearing on the issue of prejudgment interest, *i.e.,* to ascertain the truth regarding good faith efforts to settle. Civ.R. 26(B)(3) provides, in part, that "a party may obtain discovery of documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing of good cause therefor." In a prejudgment interest proceeding, the good-cause requirement of Civ.R. 26(B)(3) is that which is appropriate to effectuate the General Assembly's purposes of enacting R.C. 1343.03(C)—to encourage and bring about settlements.

In our continuing efforts to provide guidance to the bench and bar on difficult and pressing issues, we hold that in an R.C. 1343.03(C) proceeding for prejudgment interest, neither the attorney-client privilege nor the so-called work product exception precludes discovery of an insurer's claims file. The only privileged matters contained in the file are those that go directly to the theory of defense of

---

8. R.C. 2317.02(A) sets forth a *testimonial* privilege respecting communications made between an attorney and a client. R.C. 2317.02 provides, in pertinent part:

"The following persons shall not testify in certain respects:

"(A) An attorney, concerning a communication made to him by his client in that relation or his advice to his client * * *.

"(B)(1) A physician or a dentist, concerning a communication made to him by his patient in that relation or his advice to his patient * * *."

Although R.C. 2317.02 grants a privilege respecting *attorney-client* communications, the statute does not define what is meant by the term "communication" in that context. R.C. 2317.02(B)(3) *does* define "communication" in the context of the physician/dentist and patient relationship to mean "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements *necessary to* enable a physician or dentist to *diagnose, treat, prescribe,* or act for a patient." (Emphasis added.) Thus, R.C. 2317.02 provides only minimal guidance on the question concerning privileged attorney-client communications that may be contained in an insurer's claims file. However, given the definition of "communication" in R.C. 2317.02(B)(3) concerning a physician or dentist, it could be argued that, by analogy, a "privileged communication" between an attorney and a client found in an insurer's claims file should be limited to those matters going directly to the theory of defense of the underlying lawsuit.

the underlying case in which the decision or verdict has been rendered. Additionally, on occasion, this rule might also apply to the file of a party's attorney.

Having identified the character of discoverable items in an R.C. 1343.03(C) proceeding for prejudgment interest, we reiterate our holding in *Peyko, supra,* 25 Ohio St.3d 164, 25 OBR 207, 495 N.E.2d 918, paragraph two of the syllabus, that where the defense asserts a claim of privilege with regard to items contained in an insurer's claims file, the trial court shall conduct an *in camera* inspection to determine which items are privileged. Having so stated, we now move to the question of the appealability of a trial court's order compelling or denying discovery in an R.C. 1343.03(C) proceeding.

Following the ruling in *Peyko, supra,* this court then decided *Bell, supra,* 67 Ohio St.3d 60, 616 N.E.2d 181. In *Bell,* we held that the order of a trial court directing a witness opposing a request for discovery in an R.C. 1343.03(C) prejudgment interest hearing *to submit* materials to an *in camera* inspection is not a final appealable order. This court in *Bell* also, however, indicated that an order in an R.C. 1343.03(C) proceeding permitting discovery *after submission* of alleged privileged materials for an *in camera* inspection is an order affecting a substantial right made in a special proceeding. *Id.* at 64, 616 N.E.2d at 184–185. Thus, according to *Bell,* such an order is a final order subject to immediate appeal.[9] We now find this statement in *Bell* to be incorrect. The statement was based upon the assumption that prejudgment interest was not known at common law and thus a prejudgment interest proceeding was a special proceeding. As pointed out above, prejudgment interest *was* known at common law and, thus, any order made in a prejudgment interest proceeding is not one made in a special proceeding.

Accordingly, we further modify *Bell* to correct our error. In doing so, we hold that an order compelling or denying discovery in an R.C. 1343.03(C) proceeding for prejudgment interest does not meet the definition of "final order" set forth in R.C. 2505.02. Such an order does not determine the action or prevent a judgment, nor is it rendered in a special proceeding. Thus, an appeal from such an order must await final judgment in the prejudgment interest proceeding.

---

9. R.C. 2505.02 reads:

"An order that affects a substantial right in an action which in effect determines the action and prevents a judgment, an order that affects a substantial right made in a special proceeding or upon a summary application in an action after judgment, or an order that vacates or sets aside a judgment or grants a new trial is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial.

"When a court issues an order that vacates or sets aside a judgment or grants a new trial, the court, upon the request of either party, shall state in the order the grounds upon which the new trial is granted or the judgment vacated or set aside."

### F. R.C. 1343.03(C) Applied to this Case

The court of appeals' majority, citing *Kalain, supra,* 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572, affirmed the judgment of the trial court denying appellant's motion for prejudgment interest. Specifically, the court of appeals' majority found that Figgie was not obligated to make a monetary settlement offer because Figgie possessed a good faith, objectively reasonable belief that he was not liable to appellant. We find that determination to be untenable on the facts of this case.

Figgie never made any offer to settle. If Figgie ever had a good faith, objectively reasonable belief that he had no liability, the fact that the "arbitration" panel unanimously found against Figgie should have apprised him that a finding of liability at trial was possible, if not probable. Given the substantial amount of conflicting evidence in this case, the fact that medical records disappeared and were altered and the unanimous determination of the panel of "arbitrators," the inescapable conclusion is that Figgie failed to rationally evaluate his potential liability. Appellant made monetary settlement offers within the limits of Figgie's malpractice insurance coverage. One such offer was for approximately $4.3 million—the value placed upon this case by the "arbitration" panel, which did not consider the issue of punitive damages. Figgie refused to engage in any settlement negotiations.

We find that, as a matter of law, prejudgment interest should have been awarded on the facts of this case. The trial court's failure to award prejudgment interest was an abuse of discretion.[10] We further find that the accrual date of Moskovitz's survival cause of action was January 1, 1988,[11] and prejudgment interest at the statutory rate is to be computed from and including that date up to and including the date the judgment is paid. As to the wrongful death portion of the judgment, interest is to be calculated from and including the date of death,

---

10. The prejudgment interest proceeding concluded after a hearing over two days and produced a transcript of three hundred thirty-eight pages. The trial court, without explanation, denied prejudgment interest.

11. For purposes of determining the accrual date of the survival action, several events that occurred between November 1987 and the end of January 1988 are significant. These events include the removal of the tumor and the diagnosis of malignancy on November 10, 1987, the identification of the type of tumor on November 13, 1987, Moskovitz's apparent knowledge on November 11, 1987 that the tumor was malignant, and Figgie's receipt of the medical records in December 1987 and the disappearance of those records possibly in January 1988 (see *Frysinger v. Leech* [1987], 32 Ohio St.3d 38, 512 N.E.2d 337, paragraph one of the syllabus). Although it is difficult to determine the precise accrual date of the survival cause of action given the state of the record before us, we find that January 1, 1988 is the appropriate date of accrual to be used in the calculation of prejudgment interest.

December 5, 1988, up to and including the date the judgment is paid. The amount of interest is to be computed by the trial court upon remand.

## IV

### Sanctions

The final issue presented for our consideration is whether it was proper for the trial court to have sanctioned appellant's attorney, Charles Kampinski, under Civ.R. 11. Sanctions were awarded in favor of Dr. Makley in the amount of $4,000. This award was based upon the fact that Kampinski did not present expert testimony against Makley at trial to establish that Makley's treatment of Moskovitz deviated from accepted standards of care. The trial court concluded that Kampinski did not have good and reasonable grounds to pursue the action against Makley, particularly after the "arbitration" panel found in favor of Makley on the issue of liability. The trial judge who decided this issue was not the same judge who had presided over the case at trial.

As a preliminary matter, we note that Kampinski, in his individual capacity, did not file a notice of appeal from the judgment of the court of appeals affirming the $4,000 award in favor of Makley. That is, Kampinski currently represents the appellant in this case, and he properly filed a notice of appeal *for appellant*, without indicating that he himself was appealing from the sanctions imposed upon him personally. To complicate matters, the attorneys who represented both Makley and Figgie do not claim to represent Makley before this court. However, as attorneys for *Dr. Figgie*, they have briefed the issue of sanctions and seek to uphold the award that was granted in *Makley's favor*. The conclusion we draw is that the issue of sanctions, which affects Kampinski individually, has become an integral part of all other matters at issue in this case. We find that the notice of appeal filed by Kampinski on behalf of his client was sufficient to encompass the issue of sanctions and that Kampinski may properly be considered an appellant in his individual capacity.

Turning our attention to the merits of the issue, we believe that Kampinski should not have been sanctioned for pursuing the action against Dr. Makley for medical malpractice. The thrust of the allegations against Makley in the final amended complaint was that he unnecessarily amputated Moskovitz's leg and informed her that the amputation was to cure the cancer, rather than to ease her pain. However, in the absence of competent expert medical testimony against Dr. Makley, a prima facie case of medical malpractice could not be maintained.

In his deposition, Dr. Engleberg, plaintiff's medical expert, testified as follows:

"Q   Are you going to state at the trial of this matter [that] * * * Dr. Makley in his care and treatment of Mrs. Moskovitz deviated from the accepted standards of medical care?

"A   I will state that if, in fact, the patient was told that the procedure [amputation] was done in order to cure her or if, in fact, the patient was not shown to have had a lot of suffering and pain in that leg, then I would say Dr. Makley deviated from the standard of care.

"Q   Okay.   I want to be very clear that if she—are you talking about informed consent * * * [?]

"A   No, no.   Not necessarily written informed consent.   If the patient understood that there was no chance of cure by having her leg amputated and wanted it done anyway because she had severe intractable pain and that can be demonstrated, then I would not say his care deviated from the standard of care.

"If, on the other hand, it cannot be demonstrated that she was having severe and intractable pain in that leg and the patient did not fully understand that the procedure was not of a curative intent, then I will say he deviated from the standard of care.

"I think the jury should be able to determine which of those sets of facts, which of those scenarios would most closely reflect reality."

Engleberg further testified in his deposition that he had found no evidence of informed consent or of intractable pain.

Engleberg's deposition testimony established a reasonable basis for Kampinski to fashion a complaint against Makley for medical malpractice.   The deposition testimony of Aaron Moskovitz indicated that Mrs. Moskovitz was told that the amputation was for curative rather than palliative purposes.   Thus, the factual predicate for the expert medical testimony that Makley had deviated from accepted standards of care was established by Kampinski prior to trial.   In addition, even though the "arbitration" panel found in favor of Makley on the issue of liability, the panel noted that there was some question as to whether Moskovitz had been properly informed of the purpose of the amputation.   Moreover, given the convoluted machinations of this case, where records were altered, lost and/or not appropriately maintained and where relevant portions of Makley's teaching file had come up missing, it might very well have been legal malpractice for Kampinski not to have Makley available as a defendant at trial.

Kampinski chose not to present the evidence against Makley at trial.   Why that is, we will never know.   However, the purpose of Civ.R. 11 is to prohibit the filing of groundless complaints and the evidence establishes that the allegations asserted against Makley were asserted in good faith.   Accordingly, we reverse

the judgment of the court of appeals on this issue and vacate the $4,000 award in favor of Makley.

## V

### Conclusion

For the foregoing reasons, the judgment of the court of appeals is reversed and the award of compensatory damages is reinstated. Appellant is entitled to prejudgment interest and we remand this cause to the trial court to calculate the amount of prejudgment interest due and to enter judgment accordingly. The award of punitive damages is reinstated, but we order a remittitur of $2 million on the punitive damage award. On remand, appellant may accept the remittitur and a judgment of $1 million in punitive damages, or appellant may refuse the remittitur, in which case a new trial should be conducted only on the issue of punitive damages. The award of sanctions is vacated.

*Judgment reversed*
*and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., A.W. SWEENEY and WRIGHT, JJ., dissent.

WRIGHT, J., dissenting. I must respectfully dissent, as I would affirm in large measure the decision of the court of appeals.

## I

In Part I of the majority's opinion there is found a scholarly discussion of the criteria for punitive damages and an excellent discourse on the concept underlying the tort of spoliation of evidence. I agree that any professional, whether doctor, lawyer, or accountant, found to have committed spoliation with the intent to defraud or otherwise injure a patient or client may be subject to a claim for compensatory or nominal damages coupled with a claim for punitive damages. Further, I see no problem combining a traditional malpractice suit with a cause of action alleging spoliation of evidence. However, I do not agree with the majority's decision to permit punitive damages in a *negligence* action, because the subsequent spoliation of records does not make the original act of negligence malicious.

My major concern with the majority's opinion is its treatment of the facts surrounding the *alleged* spoliation. I agree with the suggestion in the majority's opinion that if "records were altered, destroyed or concealed by Dr. Figgie in an effort to conceal his medical negligence," an award of punitive damages may be justified in a separate cause of action. However, the question whether Dr. Figgie

"altered certain records to conceal the fact that malpractice occurred" was a hotly disputed issue at trial, an issue vigorously rebutted with lengthy testimony by Dr. Figgie and his nurse. As is true with the determination of any significant fact, it was the province of the jury to make a finding and return a verdict on the issue of the alleged spoliation of evidence. Such a determination is *not* our task. What the majority overlooked, presumably, is that the trial judge did not include in his charge to the jury one single word concerning this hotly disputed issue of spoliation. Indeed, the entire jury charge dealt strictly with medical malpractice. The plaintiff neither pleaded a cause of action for spoliation nor asked for instructions on spoliation.

I also do not agree with the majority that "[i]f appellant were constrained to bring a separate cause of action for spoliation of evidence, that claim would inevitably fail since there is no damage flowing directly from the alteration of records." Some measure of damages will flow inevitably from the alteration of records when the alteration is done to avoid liability for the physician's medical negligence. At the very least, the plaintiff may have to expend additional time and effort to reconstruct the original records. Since the purpose of the spoliation is to avoid liability, the plaintiff's ability to succeed in the negligence action may be made more difficult because of the spoliated records. This harm can be seen in the present case. Dr. Figgie relied on his version of the records to claim that he was not negligent because he had advised appellant to have a biopsy but she refused his advice. The inclusion of this statement in his records may have made appellant's claim more difficult to prove. When a physician commits spoliation of evidence to avoid liability for his or her medical negligence, the patient is automatically entitled to at least nominal damages. In some cases, for example where the spoliation impairs the future course of treatment of the patient, more than nominal damages may also result.[12]

Therefore, I would hold that a party must plead a separate cause of action for the tort of spoliation of evidence. The jury should be instructed that if it finds the defendant altered or destroyed records with the purpose of avoiding liability for his or her negligence, the jury must award at least nominal damages. The

---

12. To presume damages arise from the intentional tort of spoliation of evidence is consistent with the long-standing presumption for other intentional torts such as assault, battery and defamation. "[E]very injury imports a damage, though it does not cost the party one farthing, and it is impossible to prove the contrary; for a damage is not merely pecuniary, but an injury imports a damage, when a man is thereby hindered of his right. As in an action for slanderous words, though a man does not lose a penny by reason of the speaking them, yet he shall have an action. So if a man gives another a cuff on the ear, though it cost him nothing, no not so much as a little *diachylon*, yet he shall have his action, for it is a personal injury." *Ashby v. White* (King's Bench 1703), 2 Ld.Raym. 938, 955 (Holt, C.J., dissenting). Holt's position prevailed, as the majority was reversed by the House of Lords (1703), *id.* at 958.

jury may then proceed to the question of punitive damages. In such a situation, the test of *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, can be met as the jury can properly find that actual malice occurred due to the defendant's "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." The great probability of substantial harm to the plaintiff is that an otherwise meritorious action for negligence will be defeated due to the tortious conduct of the defendant.

Suffice it to say, contrary to the conclusion reached by the majority following its review of the record, the jury *did not* make a finding that Dr. Figgie was involved in spoliation.[13] Without such a finding and verdict, which would be tantamount to a finding of malicious intent or reckless disregard, there exists *no* basis for punitive damages. Thus, the court of appeals correctly found that punitive damages were inappropriate in this case, as this was a cause premised on negligence.

In addition to the foregoing, I note that the trial judge was well aware that the jury's total award of $3 million in punitive damages at best equalled and probably far exceeded Dr. Figgie's net worth. I believe the punitive damage award in this case violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *TXO Production Corp. v. Alliance Resources Corp.* (1993), 509 U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366; *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1; *Browning–Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.* (1989), 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219.

## II

The jury award of punitive damages having been determined to be without basis, it is perfectly clear that, as stated by the court of appeals, the compensatory damage award was excessive and the product of passion and prejudice. I am convinced that, as the court of appeals pointed out, "the jury's survivorship award [of $2 million] was impermissibly influenced by the jury's erroneous consideration of punitive damages." I also agree fully with the court of appeals that the jury's wrongful death award of $1.25 million was "manifestly excessive."

This court consistently has ruled that where an excessive verdict is the product of passion and prejudice, a new trial must be granted. *Larrissey v. Norwalk Truck Lines* (1951), 155 Ohio St. 207, 44 O.O. 238, 98 N.E.2d 419, paragraph four of the syllabus. We have emphasized, for example, that "[i]n a trial of a negligence action * * * deliberate and persistent appeals to the sympathy of the

---

13. In its first paragraph, the majority asserts that Dr. Figgie "altered certain records to conceal the fact that malpractice had occurred," as if the jury made a specific finding on this issue.

jury, either directly or indirectly, are improper, as tending to induce either excessive or inadequate verdicts as a result of such appeal to the passion or prejudice of the jury." *Book v. Erskine & Sons, Inc.* (1951), 154 Ohio St. 391, 43 O.O. 334, 96 N.E.2d 289, paragraph one of the syllabus. Thus, "where the damages awarded are excessive and appear to have been given under the influence of passion or prejudice, *the resulting prejudice cannot be corrected by remittitur*; the only recourse is the granting of a new trial." (Emphasis added.) *Id.* at paragraph two of the syllabus. See, also, *Guccione v. Hustler Magazine, Inc.* (Oct. 8, 1981), Franklin App. No. 80AP–375, unreported, at 33, 1981 WL 3516.

Even a cursory review of the record reveals that counsel for Moskovitz leveled "deliberate and persistent appeals to the sympathy of the jury," referring repeatedly, for instance, to Mrs. Moskovitz's confinement in a Nazi concentration camp during the Second World War. The record also indicates that plaintiff's counsel made the spoliation claim, not the malpractice claim, the primary focus of the trial. Moskovitz's counsel devoted most of his cross-examination of Dr. Figgie, ninety pages of testimony, to the alteration of Moskovitz's medical records. In opening statements and again in closing arguments, counsel for Moskovitz emphasized and reemphasized the issue of spoliation, alluding many times to Dr. Figgie's cover-up and the "smoking gun." Throughout the trial, counsel for Moskovitz repeatedly attempted to direct the jury's attention to the allegation that Dr. Figgie had tried to conceal his negligent treatment of Moskovitz by subsequently altering the medical records. But despite this pattern of conduct, as previously stated, the trial court never instructed the jury on the matter of spoliation or gave a limiting instruction thereon. Not even a suggestion of the spoliation issue exists in the trial court's charge to the jury.

In light of the foregoing, I believe the court of appeals correctly found that the jury was wrongfully influenced and that both the compensatory damage award and the award of punitive damages were excessive and the result of passion and prejudice. Therefore, I feel the court of appeals properly remanded the case to the trial court for a new trial on the issue of compensatory damages.

### III

I must also address the majority's position on prejudgment interest and the majority's treatment of *Bell v. Mt. Sinai Med. Ctr.* (1993), 67 Ohio St.3d 60, 616 N.E.2d 181.

The majority begins its discussion of this issue by declaring that a common-law right to prejudgment interest existed in Ohio and, therefore, contrary to a recent decision of this court, a prejudgment interest proceeding is not considered a "special proceeding" for purposes of R.C. 2505.02. Thus the majority concludes,

in paragraph four of the syllabus, that "[a]n order compelling or denying discovery in an R.C. 1343.03(C) proceeding for prejudgment interest does not meet the definition of 'final order' set forth in R.C. 2505.02."

This statement by the majority attempts to modify a decision issued by this court just last term. In *Bell* we were faced squarely with the question of whether an order for discovery in a prejudgment interest hearing was a final appealable order.

The issue we addressed in *Bell*, however, is *not* an issue before this court today. Rather, the question we must answer today is whether the award of prejudgment interest was appropriate in this case. We have not been asked to consider the appealability of an order issued during a prejudgment interest hearing. Hence, the lengthy discussion engaged in by this court concerning the appealability of an order issued during a prejudgment interest hearing is nothing more than dicta. Given the recent issuance of the *Bell* decision, the present case is not the proper forum for such a discussion. Members of this court had ample opportunity to express any reservations concerning that issue during our consideration of *Bell*, which was decided by six members of this court with the seventh member concurring in judgment only. At a minimum, because it does not address an issue before this court, the dicta should be removed from the syllabus.

I also take issue with the majority's decision of the *relevant* prejudgment interest question.

It is well-settled law that the decision to award prejudgment interest lies within the sound discretion of the trial court. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 19 OBR 123, 482 N.E.2d 1248. That decision will not be reversed by a court of appeals unless the record reflects an abuse of discretion by the trial court. *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 25 OBR 201, 495 N.E.2d 572. The phrase "abuse of discretion" is a term of art defined long ago to mean "more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court." *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855, paragraph two of the syllabus. Clearly then, the decision of the trial court in this case should remain undisturbed unless that decision was tainted by an unreasonable, arbitrary, or unconscionable attitude.

In my judgment there is *no* evidence of any abuse of discretion here. The trial court denied Moskovitz's motion for prejudgment interest only after conducting a lengthy hearing on the matter. During the hearing both sides had adequate opportunity to present their evidence and arguments. Considering the strong disagreement between the parties with respect to several significant facts as well as the lengthy testimony and evidence presented by Dr. Figgie in rebuttal to Moskovitz's charges, plainly the trial court did not abuse its discretion in

concluding that Dr. Figgie had a good faith, objectively reasonable belief that he was not liable. Based on this conclusion I believe the trial court properly held that Dr. Figgie was not obligated, pursuant to *Kalain*, to offer Moskovitz a monetary settlement offer, and that the failure to do so did not reflect a failure of good faith and, of course, did not warrant an award of prejudgment interest.

## IV

I strongly believe that the court of appeals correctly reversed and vacated the punitive damage award, reversed the compensatory damage award and remanded the compensatory damage issue for a new trial, and affirmed the denial of the motion for prejudgment interest. Thus, for the foregoing reasons I would affirm the judgment of the court of appeals in part but remand for a new trial on the issue of compensatory damages and the issue of spoliation.

MOYER, C.J., and A.W. SWEENEY, J., concur in the foregoing dissenting opinion.