JOURNAL ENTRY AND OPINION
Defendant-appellant Stanford Smith ("Smith"), through his insurance carrier (Allstate Insurance Company) which provided a legal defense to him under his policy of insurance, appeals from a jury trial verdict in favor of plaintiff-appellee John Allgood ("Allgood") (see appellate case number 76122, which includes the denial of a motion for new trial, or in the alternative, for remittitur) and a subsequent award of prejudgment interest (see appellate case number 76121). For the reasons adduced below, we affirm.
A review of the record on appeal indicates that on August 9, 1993, between the dusky hours of 8 to 8:40 p.m., Allgood was operating his motorcycle, a Kawasaki 750, northbound on East 93rd
Street in Cleveland, Ohio.[1] The weather was clear, and Allgood was not wearing a helmet and his motorcycle's lights were not turned on. A vehicle operated by Smith made a left turn directly in front of Allgood, causing Allgood to be thrown from his motorcycle, catapulting over the hood of Smith's vehicle, striking his head upon the ground. Allgood was transported to St. Luke's Hospital via Cleveland's Emergency Medical Service, which had responded to the dispatcher's call at 8:46 p.m. Allgood, in addition to abrasions on his legs and left hand, had suffered a fractured skull which damaged his cranial nerve, which resulted in a permanent loss of his sense of smell. Medical expenses incurred by Allgood were approximately $4,100.
The original Complaint alleging negligence was filed by Allgood on August 1, 1995. See Cuyahoga County Common Pleas Court Case No. 292927. On June 27, 1996, a non-binding arbitration panel found in favor of Allgood in the amount of $10,000 less 30 percent comparative negligence on Allgood's part. On February 18, 1997, on the day of trial, the case was voluntarily dismissed by Allgood. The matter was refiled on February 13, 1998. See Cuyahoga County Common Pleas Court Case No. 348970. On November 16, 1998, Allgood filed a motion in limine seeking to preclude testimony that, at the time of the accident, he was operating his motorcycle without a driver's license. The jury trial commenced before a visiting judge on November 17, 1998, at which time the motion in limine was granted in part.
At the trial Robin Allgood, Allgood's spouse, testified for plaintiff to the following: (1) she has known Allgood for approximately seven years, and has been married to him for the past three years; (2) Allgood had purchased the motorcycle a couple of days before the accident and was out riding with friends on the date of the accident; (3) she heard of the accident from Allgood's mother, who was at the hospital, sometime after 9:00 p.m.; (4) the physical description of his injuries from the accident; (5) Allgood was treated at the hospital emergency room the night of the accident and released shortly after 11:00 p.m.; (6) she took him back to the hospital a few days after the accident with complaints of pain and headaches, but he was treated and was not admitted; (7) several days after the second visit to the hospital, she took him back to the hospital a third time with complaints of pain, popping sounds in his knee which kept him from working, vomiting, and headaches, and this time he was admitted overnight for observation; (8) after the accident, she began to notice that Allgood lacked a sense of smell; (9) Allgood had a back and neck workers' compensation injury in 1988 which he was being treated for at the time of the accident.
The second witness for plaintiff, via videotape deposition, was Dr. Bruce J. Feldman, M.D. Dr. Feldman, a board certified trauma surgeon, testified that he examined Allgood, upon the request of plaintiff's counsel, on July 9, 1998 (four years and eleven months after the date of the accident). Allgood's medical records indicated that the emergency room personnel took x-rays of his spine, neck, chest, pelvis and knees, and also tested him for drugs and alcohol usage. The result of the drug/alcohol test was negative. The medical records corroborated the second, and third, visit to the hospital days following the accident and the complaints of the patient. The headaches complained of were to the front portion of the head. Dr. Feldman reviewed the CAT-scans performed on the head of the patient following the accident and concluded that a left frontal skull fracture, with bleeding into the left frontal area indicating acute trauma, was present. The physical examination of the patient in 1998, specifically the cranial nerves, indicated that the patient was unable to smell. This lack of sense of smell, also known as "anosmia," is mainly caused by trauma to the olfactory lobes of the brain, which lobes are located in the undersurface of the frontal area of the brain. Allgood also exhibited, apart from scarring on the skin surface on the knees, a problem with the right knee in that its movement to the front and back was a little excessive. Dr. Feldman maintained an expert opinion in 1998 that the following problems were exhibited and caused by the 1993 accident: (1) the frontal fracture and frontal bleeding was unresolved as the patient continued to complain of headaches; (2) the patient suffers from anosmia, which is permanent in the patient's case owing to the length of time the condition has been evident and the scarring to the brain due to the frontal bleeding; and, (3) the patient had internal derangement of the right knee due to damage to a ligament. Dr. Feldman stated that his opinion would not change in light of Allgood having prior headaches in the occipital or bitemporal areas of the brain prior to the accident because these two brain areas are located in the rear of the brain and his current headaches are located in the front area of the brain. The records indicated that the patient received no substantive medical treatment for any complaints related to the accident until the patient was examined by Dr. Feldman, and Dr. Feldman did not offer any ongoing treatment. Dr. Feldman admitted that the patient, at the time of the 1998 examination, did not tell Dr. Feldman of a head and back injury in 1988 or having received treatment for that injury from March of 1988 to November of 1993, but Dr. Feldman reviewed those records on the date of the deposition. Dr. Feldman stated that he did not see in those records that Allgood had complained of headaches behind his eyes, these "behind the eyes" headaches being three to four times per week from March of 1988 to November of 1993. The doctor then opined that, even though the complaint of headaches was "behind the eyes," that he did not agree that would be the frontal area of the brain; a "behind the eyes"-type headache could be caused by a bitemporal headache. See Feldman deposition at 39, 44. The doctor also admitted that he did not review all of the emergency room x-rays or the commentary by the emergency room examining physicians (which indicated that there was no tenderness in the knee joint immediately after the accident). The doctor explained that this lack of tenderness did not surprise him, since the painful abrasions to the knees would mask the underlying tenderness. The doctor admitted that there is no medical record, which he reviewed, documenting Allgood's alleged loss of smell. The doctor described the skull fracture as not being depressed, which indicates a conservative treatment plan where nothing physically is done to the area of the fracture. The emergency room physician did not test cranial nerve number 1, so the anosmia was not detected; however, Allgood did not complain of a loss of smell when he presented himself for examination in 1998. Feldman deposition at 49.
Following the testimony of Dr. Feldman, the defense reargued the motion in limine relative to excluding evidence regarding Allgood, on the date of the accident, not having a valid motorcycle endorsement (see R.C. 4507.02[A] [1]) and driving under a suspended driver's license (see R.C. 4507.02[A] [3]). The defense argued that these matters are admissible for impeachment purposes and to demonstrate proximate cause for the accident. (Tr. 59-60.)
The third witness for the plaintiff was Allgood, who recounted the events involved in the accident, the injuries sustained, and subsequent medical care. Allgood testified, generally, to the following: (1) he is thirty-six years old, married with one daughter, and employed; (2) he has been driving motorcycles since he was nine years old; (3) he purchased the dark brown-colored motorcycle in question for $1,000 approximately two weeks prior to the accident; (4) the motorcycle was very loud because he had modified the exhaust pipe; (5) he, attired in dark clothing and wearing goggles with dark lenses, was riding with two other friends on the date of the accident; (6) he was in the curb lane of East 93rd Street stopped at a red light, when another car pulled up beside him in the inside lane of traffic; (7) when the light turned green, the traffic proceeded forward, and the other car was approximately three to four car lengths ahead of the motorcycle; (8) as he shifted from first gear to second gear, traveling at approximately 25 mph, he looked up to see Smith's car (which was traveling along East 93rd Street in the opposite direction as Allgood) making a turn in front of him in the vicinity of the intersection with Orleans Avenue; (9) Allgood slammed on his brakes, locking the brakes up, and the front end of Smith's car struck the motorcycle, which was the last thing he remembered until waking up in the hospital; (10) the sun was shining at the time of the accident, sometime between 7 to 8:00 p.m.; (11) his second visit to the hospital was caused by an infection to the abrasions and headaches; (12) it was during his overnight visit to the hospital that the staff performed a CAT-scan on his head, finding the fracture to his skull and internal cranial bleeding; (13) the injury in 1988 was to his back and back of his head when a filing cabinet fell against him, and the resulting headaches emanated from the rear of his head, not the area causing the headaches from the motorcycle accident; (14) the distance between Aetna and Orleans Avenues along East 93rd Street is approximately 200 feet; (15) despite being treated for the work injury from 1988 to early-1995, he never informed that treating physician (Dr. Kay) about the motorcycle accident because the work-related, injuries and complaints were different from the motorcycle accident complaints; (16) it was not until Dr. Feldman's examination that he realized that his loss of smell, which he had noticed after the accident, was caused by the accident.
The fourth witness for plaintiff was Mr. Tossie Wiley, Jr., a local attorney and minister, who happened to have witnessed the accident. Mr. Wiley stated, in pertinent part, that: (1) he had just left his church at approximately 8:50 to 8:55 p.m. (He was not entirely sure of the time) when, while waiting at a stop sign at the intersection of East 93rd Street and Orleans Avenue, the accident occurred; (2) the weather was dry, it was dark and cars had their lights on (Tr. 103); (3) he had difficulty seeing Allgood's motorcycle; (4) he was not certain of the motorcycle's speed, did hear the motorcycle engine revving up as it shifted gears, and when he noticed the oncoming motorcycle several seconds prior to the accident, he (the witness) stopped and did not proceed into the intersection; (5) the car that struck the motorcycle, which slowed down briefly prior to making the turn into the path of the motorcycle, did have its lights on; (6) he remembered the motorcycle driver as wearing dark clothing; (7) he made the 9-1-1 call; (8) he did not believe that the street lights were on.
The defense offered the testimony of Mr. Robert Livingston, an eyewitness to the accident, who testified in pertinent part to the following: (1) on the date of the accident he was a City of Cleveland Police Detective; (2) at the time of the accident he was stopped on Aetna Avenue at a stop light at the intersection of East 93rd Street; (3) he observed the motorcycle stopped at the light of East 93rd, and saw the motorcycle proceed when that light turned green; (4) the witness claimed that the motorcycle accelerated at a high rate of speed, then his left arm went up and a leg went out from the bike after traveling half a block, then he saw a cloud of dust and the motorcycle rider flying through the air; (5) the witness then used his car radio to call the police dispatcher to send an ambulance; (6) the witness estimated the motorcycle's speed in excess of approximately 50 mph as the motorcycle approached Orleans Avenue, perhaps as much as 80 mph; (7) he did not see the vehicle that the motorcycle impacted; (8) the distance between Aetna Avenue to the impact site is approximately 220 feet; (9) it was between 8:30 to 8:40 p.m. at the time of the accident and the sun had not set yet, it was dusk; (10) where the witness was sitting at the accident, it was "bright out" (Tr. 183); (11) he had no problem seeing or hearing the motorcycle, which was revving its engine and shifting gears; (12) the victim traveled approximately thirty feet through the air after the impact.
The final witness for the defense was Mr. Smith, whose deposition was read to the jury. Mr. Smith testified in pertinent part as follows: (1) he was born on April 13, 1941, and is employed as an insurance salesman; (2) his vehicle in the accident was a 1987 Volvo, Model 740; (3) the time of the accident was between 8:30 to 9:00 p.m., at dusk and it was getting dark; (4) he had his headlights on, but did not recall if the street lights were on or not; (5) the natural lighting conditions did not obstruct his vision; (6) he came to a momentary stop, for five seconds or so, before making his left turn onto Orleans Avenue from East 93rd
Street; (7) in the turn he used his car's turn signal, starting approximately 50 feet prior to the intersection; (8) he never saw Allgood's motorcycle until after the impact with his right front fender; (9) he was not injured, but the fender had to be replaced.
The jury returned a unanimous verdict on November 19, 1998, finding Allgood to be 25 percent comparatively negligent, and awarding Allgood $91,500 in damages. Due to Allgood being found to be 25 percent negligent, the award was reduced to $68,625. This judgment was journalized on November 23, 1998.
On December 3, 1998, Allgood filed a motion for prejudgment interest. The defense, on December 7, 1998, filed a motion for a new trial, or in the alternative, a motion for remittitur. Allgood filed his brief in opposition to new trial/remittitur on December 14, 1998. The defense filed its brief opposing prejudgment interest on December 17, 1998. Thereafter, on January 22, 1999, Allgood filed a supplemental brief in support of prejudgment interest.
The trial court, subsequent to an evidentiary hearing conducted on January 29, 1999, on the motion for prejudgment interest, granted the motion on February 9, 1999, without opinion using a half-sheet status form entry, awarding prejudgment interest from August 9, 1993 to the date of the trial judgment. The trial court also denied new trial/remittitur on February 10, 1999, without opinion using a half-sheet status form entry.
The defense filed its notice of appeal on March 10, 1999, from the February 9, 1999 order granting prejudgment interest. See appellate case number 76121. The defense filed its notice of appeal on March 10, 1999, from the February 10, 1999 order denying a new trial/remittitur. See appellate case number 76122.
Appellant-Smith presents two assignments of error for review.
 I THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT GRANTED PLAINTIFF-APPELLEE'S MOTION IN LIMINE AND PRECLUDED TESTIMONY THAT PLAINTIFF-APPELLEE WAS DRIVING WITHOUT A DRIVER'S LICENSE.
In Collins v. Storer Communications, Inc. (1989), 65 Ohio App.3d 443,446, the court stated:
 A motion in limine, if granted, is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issues. * * * Accordingly, a proponent * * * must seek the introduction of the evidence by proffer or otherwise at trial in order to enable the court to make a final determination as to its admissibility and to preserve any objection on the record for purposes of appeal.
See, also, Gibson v. Gibson (1993), 87 Ohio App.3d 426, 430-31.
The record demonstrates that the defense preserved the motionin limine ruling when the defense argued, unsuccessfully, for the admission of the evidence at trial.
This court discussed the standard of review for a ruling on a motion in limine in Hocevar v. Rao (Dec. 3, 1998), Cuyahoga App. No. 72671, unreported, 1998 WL 842070, at 2-3:
 * * * it is well established that a trial court's determination whether to admit or exclude evidence will not be reversed on appeal absent a clear and prejudicial abuse of discretion. O'Brien v. Angley (1980), 63 Ohio St.2d 159, 163, 407 N.E.2d 490. * * *.
 Evidence Rule 403(A) specifically mandates that evidence be excluded when its probative value is outweighed by its tendency to confuse the issues or mislead the jury.
 To constitute an abuse of discretion, the trial court's ruling must be arbitrary, unreasonable and so palpably and grossly violative of fact and logic as to indicate perversity, passion, or prejudice. Nakoff v. Fairview General Hosp. (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1.
 Under the circumstances, the trial court could properly find that the excluded evidence would unduly confuse the issues or mislead the jury. The fact that another judge or the appellate court might have reached a different conclusion than that of the trial court does not establish that the trial court abused its discretion. Kitchens v. McKay (1987), 38 Ohio App.3d 165, 169; 528 N.E.2d 603.
In the case sub judice, it was not demonstrated that Allgood's failure to have a valid driver's license with a motorcycle endorsement was causally related to the accident or resulting injuries. Accordingly, the trial court did not abuse its discretion in precluding this licensing evidence.
The first assignment of error is overruled.
 II THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DETERMINED THAT THE PLAINTIFF-APPELLEE WAS ENTITLED TO PREJUDGMENT INTEREST.
The award of prejudgment interest is authorized pursuant to R.C. 1343.03, which states:
 (C)(1) In addition to the post-judgment interest described in division (B) of this section, interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties shall be computed from the date the plaintiff gave the defendant written notice in person or by certified mail that the cause of action accrued until the date that the judgment, decree, or order for the payment of money is rendered or from the date the plaintiff filed a complaint to commence the civil action until the date that the judgment, decree, or order for the payment of the money is rendered, whichever time period is longer, if, upon motion of any party to the civil action, the court determines at a hearing held subsequent to the verdict or decision in the civil action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.
 (2) The prejudgment interest payable pursuant to division (C)(1) of this section shall be calculated from the date the plaintiff gave the defendant written notice in person or by certified mail that the cause of action accrued until the date that the judgment, decree, or order for the payment of the money is rendered or from the date that the plaintiff filed the complaint to commence the civil action until the date that the judgment, decree, or order for the payment of the money is rendered, whichever time period is longer, at the rate that is fifty per cent of the per annum rate determined in accordance with division (B) of section 5703.47 of the Revised Code.
 (3) No award of prejudgment interest shall include any prejudgment interest on future damages found by the trier of fact. "Future damages" means economic loss and noneconomic loss, as defined in section 2323.54 of the Revised Code, that is awarded to compensate the claimant for losses or costs that will occur after the date of judgment. (Italicization added.)
In analyzing another case involving an award of prejudgment interest and a defendant represented by an insurance company, the following standard of review was stated:
 The party seeking prejudgment interest bears the burden of demonstrating that the other party failed to make a good faith effort to settle the case. Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638, 659, 635 N.E.2d 331. The ultimate decision as to whether a party's settlement efforts constitute a failure to make a good faith effort is committed to the sound discretion of the trial court. Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87, 482 N.E.2d 1248. An appellate court will review the determination for abuse of that discretion. Mobberly v. Hendricks (1994), 98 Ohio App.3d 839, 845, 649 N.E.2d 1247. An allegation that the trial court abused its discretion in awarding prejudgment interest is tantamount to alleging that the trial court acted unreasonably, arbitrarily, or unconscionably. DiPiero v. Bianco, 1990 Ohio App. LEXIS 468 (Feb. 1990), No. 88-T-4090, unreported, 1990 WL 10958, at 2. Such judgments, which rely so heavily on findings of fact, will not be disturbed on appeal as being unreasonable or arbitrary if supported by some competent, credible evidence. Smith v. Jaskowiak, 1991 Ohio App. LEXIS 2344 (May 1991), No. 90-T-4365, unreported, 1991 WL 84230, at 3; Wingard v. Johnson (June 30, 1986), Portage App. No. 1628, unreported, 1986 WL 7310, at 1.
 Where, as here, the defendant in a lawsuit is represented by an insurance company, the court's inquiry as to whether the defendant made a good faith effort to settle must necessarily focus on the settlement efforts of the insurance carrier. See Moskovitz, supra, at 660, citing, Peyko v. Frederick (1986), 25 Ohio St.3d 164, 166-167, 495 N.E.2d 918. The Supreme Court of Ohio has indicated that a trial court should decline to impose a prejudgment interest penalty on the party obligated to pay the judgment where that party: (1) fully cooperated in discovery, (2) rationally evaluated risks and potential liability, (3) did not attempt to delay the proceedings unnecessarily, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. Kalain v. Smith
(1986), 25 Ohio St.3d 157, 495 N.E.2d 572, syllabus. (Italicization added.)
Loder v. Burger (Lake, 1996), 113 Ohio App.3d 669, 674.
In order to assess the merits of this assignment, a review of the evidence produced at the evidentiary hearing on the motion for prejudgment interest is necessary.
Counsel for plaintiff-appellee Allgood, attorney Scott Rumizen, testified in pertinent part as follows: (1) he has been practicing law for six-and-one-half years and is also licensed in the State of New York; (2) he first became involved in the Allgood litigation in 1995, a few months prior to filing the original Complaint; (3) plaintiff's counsel sent a letter to Allstate approximately six-to-eight weeks prior to the expiration of the statute of limitations, generally seeking to settle the matter out-of-court, but there was no response to the letter so he filed the action; (4) following the deposition of Allgood in April 1996, the witness, speaking to then-defense counsel John Owens, offered to settle the case for $12,000 to $15,000; (5) Exhibit 5, attached to the supplemental brief in support of the motion, is a memorandum from attorney Owens to Allstate evaluating the deposition of Allgood; (6) this evaluation stated that Allgood was a "good witness"; (7) there followed no settlement negotiations since Allstate denied liability and wanted to refer the case to arbitration, which was accomplished; (8) the same fact witnesses as appeared at the trial appeared at the arbitration hearing, except for Robin Allgood (who did not testify regarding Allgood's injuries) and Dr. Feldman, and the arbitration panel awarded Allgood $7,000 ($10,000 minus 30 percent comparative negligence); (9) the defendant appealed the arbitration award; (10) after receiving the notice of appeal of the arbitration award, the witness asked Allstate employee, Dennis Dijulius, if they could negotiate a settlement, however, Dijulius maintained there was no liability; (11) he voluntarily dismissed the original action because plaintiff did not have a medical expert; (12) the refiled Complaint alleged the same facts as the original Complaint; (13) in the refiled action, the parties, at the suggestion of defense counsel, stipulated to using the discovery from the original action in the refiled action; (14) given the no-settlement posture of the defense which was exhibited in the original action, the witness did not advance settlement negotiations in the refiled action (Motion Tr. at 27); (15) this no-settlement posture was made evident in the refiled action when, via letter dated October 19, 1998 from Allstate claims adjuster Mr. Monroe Curry to plaintiff's counsel, it was expressed that Allstate maintained there was no liability and to direct future communications to defense counsel (Ms. Marilyn Singer); (16) in response to this letter, the witness placed a telephone call to the writer, but the writer never returned the call; (17) at the final pretrial conference prior to the trial (which was not attended by anyone from Allstate, such as the claims adjuster), Ms. Singer indicated that there was no liability and there would be no offer of settlement; (18) the pre-original Complaint letter offering to explore the potential for a settlement did not contain a specific dollar figure demand by counsel; (19) at the arbitration hearing, he did not have a medical expert's report; (20) he, relying on Ms. Singer's expressed intention that there was not going to be an offer of settlement by the defense, never initiated a demand offer to attorney Singer; (21) he believed that at the final pretrial he gave the judge a demand figure for settlement, but did not specifically remember the amount; (22) at the final pretrial, the judge asked whether Allgood would settle for his medical specials (approximately $4,100), but the witness advised the judge that Allgood would not settle for the amount of the specials because the case was worth more in counsel's estimation.
The final witness for Allgood at the motion hearing was Mr. Carl Chiappetta, an Allstate insurance adjuster, who testified in pertinent part as follows; (1) he has had over fourteen years of claims adjusting experience in the insurance industry, some of it in a supervisory capacity, and has been employed by Allstate since October 13, 1998; (2) the claim file for the Allgood matter was given to him by Mr. Monroe Curry, his supervisor, a few days before the case went to trial; (3) when he was handed the file by Mr. Curry, he did not open it, look through it, or review it to see what the file was about; (4) it is Allstate's internal policy that only the claims adjuster on a case has the authority to settle a case, so the attorney retained by Allstate to represent the insured cannot offer anything in settlement without first getting the authority to offer that amount from the adjuster; (5) he never gave attorney Singer authorization for any money to attempt to settle the case and, instead of opening the file and looking at it when he received the file from his supervisor, he put it in a file drawer in his office at Allstate; (6) he did not go to the trial and did not review the progress of the trial with defense counsel as the trial proceeded; (7) he was startled by the results of the trial, yet he did not review the file even after the trial; (8) notes contained in the file by Mr. Pomeranz, an independent investigator who reviewed the file in October of 1993 for Allstate, evaluated Detective Livingston as a "fair to poor" witness, and noted that Livingston indicated that it was "daylight" at the time of the accident; (9) in a letter from Ms. Singer to Jim Taminsky, a claims representative at Allstate, dated March 26, 1998, counsel indicated that she had two independent witnesses., Mr. Wiley and Detective Livingston, whom she would present at trial to testify that Allgood's motorcycle was not visible when the defendant began his left turn (the defense never presented such evidence); (10) Ms. Singer claimed that this information was a mistake, that she was referring to Mr. Wiley and Allgood, and phrased it improperly in the letter (Motion Tr. 50-51).
The defense offered no witnesses on its behalf at the motion hearing.
Based on the foregoing, we cannot conclude that the trial court abused its discretion in granting the motion for prejudgment interest.
Assignment overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of Appellate
 ________________________ JAMES D. SWEENEY, JUDGE
 DYKE, A.J. and KARPINSKI, J., CONCUR.
[1] It was stipulated by the parties that, on the date of the accident, sunset occurred at 8:35 p.m.