OPINION
{¶ 1} The defendant-appellant/cross-appellee, Eaton Corporation, appeals the July 23, 2003 judgment of the Common Pleas Court of Marion County, Ohio, asserting as error the April 4, 2003 judgment of that court, which ordered it to pay $1,150,000.00 to the plaintiff-appellee/cross-appellant, Leonard Maynard, pursuant to a jury verdict in favor of Maynard. In addition, the appellee/cross-appellant likewise appeals the July 23, 2003 judgment, which denied his motions for attorney's fees and pre-judgment interest.
{¶ 2} The facts adduced at trial relevant to these appeals are as follows. In 1997, Eaton Corporation ("Eaton") operated a forging plant in Marion, Ohio, wherein it produced steel parts for large vehicles, such as buses and semi-tractors.[1] In order to manufacture these parts, the steel has to be heated to extremely high temperatures so that the steel can be pressed by heavy-duty presses inside the forge shop and later shaped. The energy necessary to heat the steel is supplied through the plant's north electrical substation, which is located outside the plant and surrounded by high fencing with barbed wire on top. Within the substation is a circuit breaker on the power line that supplies power to the two steel presses. The purpose of the circuit breaker is to stop the flow of electricity, a necessary safety device. Inside the circuit breaker there are two contacts immersed in oil, which is used for insulation purposes. Below the contacts is a small pin, which is used to open and close the contacts.
{¶ 3} When there is an overload in the system, the circuit breaker opens deliberately forcing the contacts open, which controls the flow of the electricity. There are two ways to close the contacts and reset the circuit breaker. Inside the factory, there is a button to press, which causes a pneumatic close (air pressure forces the pin upward closing the contacts and reversing the overload). This type of close happens quickly and with much force because a slow close causes an electrical arc between the contacts that can be damaging. The other method is to close them manually.
{¶ 4} For approximately twenty-nine years, Leonard Maynard was employed by Eaton in various positions. The last eight of these years Maynard worked third shift from 11:00 p.m. until 7:00 a.m. as a maintenance supervisor for the company. In that capacity, Maynard oversaw the mechanics, electricians, forklift drivers, and laborers. At approximately 5:00 a.m. on December 12, 1997, Maynard was working his normal shift when the third shift forge shop supervisor, Dan Bolton, told him that there was smoke in the plant's north substation. Maynard immediately proceeded to the substation and grabbed a fire extinguisher as he entered. Upon arriving, he noticed Steven Dailey, a journeymen electrician employed by Eaton, working with a hydraulic jack that had been placed under the circuit breaker by Dailey earlier in the shift to enable the 60c press to run. Maynard also saw small drops of insulation sparks dropping on Dailey's back. Maynard ordered Dailey to leave and extinguished the flames. By this time, Bolton was also in the substation. Seconds after extinguishing the flames, the circuit breaker exploded.[2] As a result, Maynard was severely injured and has not been able to work since the explosion. In addition, Dailey and Bolton were injured.
{¶ 5} On June 7, 1999, Maynard filed a complaint in the Marion County Court of Common Pleas against Eaton. The complaint alleged, inter alia, that Eaton was liable to Maynard for committing an employer intentional tort against him. Eaton denied these allegations, and the matter proceeded. Eventually, the case came to trial on March 11, 2003. The liability and damages phases were separated, and the trial as to the issue of liability continued until March 14, 2003. At the conclusion of the liability portion of the trial, the jury found in favor of Maynard. Thereafter, on March 17, 2003, the trial proceeded to the issue of damages, and the jury awarded Maynard $950,000.00 in compensatory damages and $200,000.00 in punitive damages. In recognition of this verdict, on April 4, 2003, the trial court ordered Eaton to pay a total of $1,150,000.00 to Maynard. Subsequently, Maynard filed motions for pre-judgment interest and attorney's fees. These motions were overruled on July 23, 2003. These cross-appeals were then filed, and Eaton now asserts four assignments of error and Maynard asserts three cross-assignments of error.
 First Assignment of Error of Eaton
The trial court erred to appellant's prejudice by admitting into evidence, over appellant's objections, the fact that the occupational safety and health administration (OSHA) issued citations to appellant alleging violations of the occupational safety and health act's regulations arising out of the incident giving rise to plaintiff's action and this despite appellant having entered into a settlement agreement with OSHA that it was not admitting appellant violated osha's regulations.
{¶ 6} Eaton first maintains that the trial court improperly admitted various citations issued by OSHA as a result of the substation explosion. Specifically, Eaton asserts that these post hoc citations did not demonstrate that Eaton had any knowledge of dangerous conditions in the Marion forging plant at the time Maynard was injured. Moreover, Eaton contends that the citations were not relevant as to the existence of any dangerous condition given its settlement with OSHA, wherein they agreed that the settlement was not an admission by Eaton of any OSHA violation and were not to be used for any other purpose.
{¶ 7} This Court's analysis of this issue begins by noting that "the decision of whether or not to admit evidence rests in the sound discretion of the [trial] court[.]" Wightman v.Consolidated Rail Corp. (1999), 86 Ohio St.3d 431, 437, citingPeters v. Ohio State Lottery Comm. (1992), 63 Ohio St.3d 296,299; see, also, State v. Sage (1987), 31 Ohio St.3d 173, 182. Thus, this Court will not disturb the trial court's decision unless the court abused its discretion. When applying the abuse of discretion standard, this Court is not permitted to simply substitute its judgment for that of the trial court. State, exrel. Duncan v. Chippewa Twp. Trustees (1995), 73 Ohio St.3d 728,732. Rather, in order to reverse the decision of the trial court, we must determine that the trial court's action is "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." Nakoff v. Fairview Gen. Hosp.
(1996), 75 Ohio St.3d 254, 256. Thus, it is within the foregoing constructs that we proceed to determine the propriety of the admission of this evidence.
{¶ 8} The Rules of Evidence state that "[a]ll relevant evidence is admissible, except as otherwise provided * * * by these rules[.]" Evid. R. 402. The term "relevant evidence" is also defined by the Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. However, Evid. R 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." In addition, the Rules of Evidence explicitly exclude a myriad of potentially relevant items from trial, such as character evidence, hearsay, and subsequent remedial measures. Nevertheless, at times there are exceptions to these exceptions, such as when the party against whom they are used "opens the door" to allow these forbidden types of evidence. See Evid.R. 404(A), 607, 608, 609.
{¶ 9} In the case sub judice, Eaton contends that the OSHA citations should not have been permitted into evidence. In support of this contention, Eaton cites various appellate cases, wherein evidence of post hoc OSHA citations was not admissible. See, e.g., Vermett v. Fred Christen Sons Co. (2000),138 Ohio App.3d 586, 603; Cross v. Hydracrete Pumping Co, Inc. (1999),133 Ohio App.3d 501, 507. However, these cases involve the use of OSHA citations by the plaintiff in his case-in-chief in order to establish one or more of the elements of an employer intentional tort. That is not the case here.
{¶ 10} In Maynard's case-in-chief, the OSHA citations that resulted from the incident in question were never referenced. Rather, Maynard presented the testimony of several witnesses regarding the days leading up to and including the day of the incident, the training and practices of the electricians at Eaton, including Stephen Dailey, the duties and training of Maynard, and the circumstances surrounding the incident, as well as expert testimony concerning the cause of the explosion. This evidence, although contradictory at times, demonstrated that neither Maynard nor Dailey, an electrician at Eaton, as well as other electricians, were adequately trained as to the proper practices involved with working in an electrical substation and that some of the mechanisms in the substation were not properly functioning, resulting in the explosion that injured Maynard and his co-workers.
{¶ 11} Eaton then presented the testimony of Joe Higley, its Health and Safety Manager at the time of the explosion, during its case-in-chief. Among other things, Higley testified that his job duties included "creating safety policies, which OSHA require[d.]" Higley also testified about various safety awards received by Eaton during 1997, from different associations, including an award that compared Eaton's performance "safety-wise" with others in the forging industry. Higley then testified as to these comparisons and that Eaton's employees had been "working at safety" in 1997.
{¶ 12} Upon cross-examination, counsel for Maynard introduced the citations issued by OSHA as a result of the substation explosion and had Higley identify and read them aloud. These citations noted, inter alia, that the employees were not trained with regard to safe work practices necessary for their safety, that the work in the substation was not supervised and inspected to ensure safe performance, that the work and maintenance was not reviewed in order to insure the tasks were planned and adequate, and that proper emergency procedures were not employed.
{¶ 13} While we agree with Eaton that this information was damaging to its defense, it opened the door to such evidence through the testimony of Higley. Particularly, Higley's testimony concerning the awards in recognition of the plant's safety, the fact that the employees were "working at safety," and that he was responsible for creating safety policies required by OSHA, opened the door for Maynard's counsel to provide evidence to the contrary, including evidence that citations for safety violations were issued in 1997. In essence, the 1997 OSHA citations, albeit post hoc, were used to directly rebut the 1997 safety awards. Thus, this evidence was introduced to challenge Higley's testimony and the documentary evidence submitted by Eaton as to the awards and safety practices rather than to establish the necessary elements for employer intentional tort.
{¶ 14} Moreover, the appropriateness of this evidence is not altered by the fact that Eaton entered into a settlement agreement with OSHA regarding these violations, wherein it did not admit any fault on its part. Eaton was permitted to introduce the settlement agreement during re-direct, to have Higley read the portion regarding no admissions on Eaton's part, to discuss how these citations were labeled as serious rather than willful, and to otherwise fully discuss the contents of the settlement and Eaton's motivation in settling these citations. In addition, the trial court provided a limiting instruction immediately following Higley's testimony as to the use of the OSHA citations. Specifically, the court instructed the jury that these citations were not dispositive of the issue of intent or whether an intentional tort was committed, and the court further instructed the jury that it would receive full instructions regarding the claim for employer intentional tort, which it did.
{¶ 15} Given the nature of Higley's testimony, the latitude provided by the trial court to Eaton in order to allow it to raise the issue of weight to be given to these citations, and the limiting instruction given to the jury, we do not find that the trial court's decision was so palpably and grossly violative of fact or logic that it evidenced not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. In addition, as previously noted, the trial court permitted evidence of these citations in order for the plaintiff to rebut Higley's assertions of safety during his cross-examination, not in Maynard's case-in-chief to establish the existence of an employer intentional tort. Therefore, the trial court did not abuse its discretion, and Eaton's first assignment of error is overruled.
 Second Assignment of Error of Eaton
The trial court erred in submitting the issue of punitive damages to the jury.
{¶ 16} Eaton next asserts that the trial court erred in instructing the jury on the issue of punitive damages. In order to award punitive damages in a tort action, the action must involve fraud, malice, or insult. Roberts v. Mason (1859),10 Ohio St. 277, paragraph one of the syllabus; see, also, Zoppo v.Homestead Ins. Co. (1994), 71 Ohio St.3d 552, 557-558; Prestonv. Murty (1987), 32 Ohio St.3d 334. Here, there was no allegation of fraud or insult, thus malice was the sole basis for the award of punitive damages. Regarding malice, the Ohio Supreme Court has determined:
actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. In the latter case, before submitting the issue of punitive damages to the jury, a trial court must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm. Furthermore, the court must determine that sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety.
Preston, 32 Ohio St.3d at 336.
{¶ 17} In the case sub judice, Maynard did not assert that Eaton acted with hatred, ill will, or a spirit of revenge. Rather, Maynard relied on the latter requirement of Preston,
i.e., a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. Thus, the trial court had to determine whether reasonable minds could differ as to whether Eaton was aware that its actions had a great probability of causing substantial harm and that there was sufficient evidence that Eaton consciously disregarded Maynard's safety.
{¶ 18} Here, Maynard presented evidence that production at Eaton was the main priority and that the presses were the most important machines in the forge shop. Evidence was also presented that the maintenance department, including the electricians, often engaged in "jerry-rigging" (i.e., quick fixes) to keep the machinery operational. In addition, although conflicting at times, testimony was given that the circuit breaker in the substation, which controlled 34,500 volts of electricity, had been malfunctioning and the journeymen electricians had been using a hydraulic jack to close the breaker in order to reset it and allow electricity to flow in an effort to keep the presses running, including while under power. In addition, the circuit breaker was a safety device that was disabled on various occasions in order to resume power, but the substation was never shut down in order to effectively pinpoint and remedy the problem.
{¶ 19} Dailey also testified that he was not trained in the operations of the substation and the various safety measures to employ but that he was told to use the jack in order to close the circuit breaker and allow production to continue, which he did earlier in the shift to enable the 60c press to run. Moreover, evidence was presented that the location of the jack prevented the circuit breaker from opening as needed on the night of the incident, resulting in the creation of an electrical arc that caused the explosion. Furthermore, although a two hour seminar dealing with some substation issues was given in 1995, the Ohio Edison employee that gave this lecture admitted that the circuit breaker at issue in this case was not discussed and other Eaton electricians admitted that they were not trained in high voltage equipment.
{¶ 20} Maynard also testified that although he was the maintenance supervisor, which included supervising electricians, he was never provided any electrical training despite his repeated requests for such training. Further, although Eaton had a fire brigade comprised of various Eaton employees, the testimony revealed that fires at the forging plant occurred on a regular basis and that the employees often extinguished these fires, if small in size, without calling for the fire brigade because such a call would stop production. Lastly, the evidence demonstrated that as part of Maynard's duties as maintenance supervisor, he was expected to respond to problems within the plant, which he was doing at the time of the explosion.
{¶ 21} Given the evidence that Eaton's journeymen electricians were provided little to no training on the high voltage equipment contained in the substation but were expected to "fix" problems occurring therein, that Eaton's primary concern was production, that it was aware that the electricians engaged in quick fixes on various machinery to keep production going, that Maynard was given no electrical training despite being the supervisor for third shift electricians, and that the substation equipment was not properly maintained, in light of the fact that the substation involved very high voltage, the trial court had sufficient evidence with which to conclude that reasonable minds could differ as to whether Eaton was aware that its actions had a great probability of causing substantial harm and that Eaton consciously disregarded Maynard's and other employees' safety. Thus, the issue of punitive damages was properly submitted to the jury, and Eaton's second assignment of error is overruled.
 Third and Fourth Assignments of Error of Eaton
The trial court erred in permitting, over appellant's objections, so-called rebuttal testimony despite the fact that there was no "New Matter" submitted in defendant-appellant's case in chief.
The trial court erred in permitting, over appellant's objections, so-called rebuttal testimony about appellant's conduct that was irrelevant and immaterial to the state of appellant's knowledge that plaintiff was intentionally exposed by appellant to a dangerous condition that was substantially certain to cause injury to plaintiff-appellee in this employment setting.
{¶ 22} Eaton's third and fourth assignments of error involve the testimony of Ted Shockley during Maynard's rebuttal portion of the trial. As these assignments are interrelated, they will be discussed together.
{¶ 23} The Ohio Supreme Court has held "[r]ebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." State v. McNeill (1998),83 Ohio St.3d 438, 446, citing N.W. Graham Co. v. W.H. Davis Co.
(1854), 4 Ohio St. 362, 381; 6 Wigmore, Evidence (Chadbourn Rev. 1976) 672-679, Section 1873. Further, "[i]t is within the trial court's discretion to determine what evidence is admissible as proper rebuttal." McNeill, 83 Ohio St.3d at 446, citing N.W.Graham Co., supra; State v. Dunlap (1995),73 Ohio St.3d 308, 316. Thus, as discussed under the first assignment of error, in order to reverse the decision of the trial court to permit Shockley's testimony, we must determine that the trial court's action is "so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias."Nakoff, 75 Ohio St.3d at 256.
{¶ 24} As previously noted, during Maynard's case-in-chief, several issues were raised regarding the training and safe work practices of Eaton's maintenance employees, particularly the electricians. In response, during Eaton's case-in-chief, it presented evidence regarding the training of its employees, including the electricians, and the safety measures it employed. This evidence revealed that its journeymen electricians were required to obtain 6,000 hours of electrical training, which included practical experience with other Eaton electricians as well as reading books and taking tests. Further, Higley testified that electrical safety training was offered to employees and supervisors in 1995, and that all employees, including the electricians, were working at safety and at complying with safe practices. Higley also testified that he held monthly safety meetings, which were open to all employees, and that the matters addressed in these meetings were posted for all employees to see. In addition, Eaton presented the testimony of Michael Ferncez. Ferncez testified that he worked for Ohio Edison and that in 1995, he presented three, identical two-hour sessions regarding the substations at Eaton and that safety was discussed in each session.
{¶ 25} During rebuttal, Maynard called Ted Shockley to testify. Shockley, who was a trained electrician, testified that he worked as a supervisor for Eaton for approximately three months in 1995. As part of his duties, he supervised the electricians. He further testified that he learned that the electricians were trained by reading training books, which they had to return to the plant's office. Shockley also testified that he questioned the training of Eaton's journeymen electricians because they were taught how to do things by other people rather than additionally learning the electrical theory behind what they were doing, in essence, "the why" a particular act was done. In addition, Shockley testified to various unsafe procedures regarding electricity, including maintenance in the substation, that he witnessed while working at Eaton and that he questioned the qualifications of some of the electricians that were performing tasks in the substation because of their lack of training. Lastly, Shockley testified that after he took another job with a different company, Eaton asked him to return. However, Shockley informed Eaton that he would not return unless Eaton engaged in more preventative maintenance and would provide more training to its employees. After these requests were made, Eaton did not make any further offers of employment to Shockley.
{¶ 26} Here, Eaton introduced new evidence during its case-in-chief. Not only did Eaton have its witnesses discuss the plans Eaton implemented to ensure safety, it also introduced awards for such safety, evidence that its electricians were specifically trained in substation safety, and that it was continually working at safety. During rebuttal, Maynard introduced evidence to rebut the training and safety issues raised by Eaton, particularly the 1995 substation training by Ferncez. Furthermore, Shockley's testimony that Eaton's job offer to him was never renewed after he demanded that the electricians receive more training because of his safety concerns, directly rebutted Eaton's evidence that safety was a primary concern and something at which all of its employees were working. Thus, the trial court did not abuse its discretion in permitting Shockley's testimony.
{¶ 27} Moreover, Eaton's contention that this rebuttal was not relevant or material to the 1997 explosion because Shockley worked for Eaton for a short while in 1995 is without merit. The training, some of which occurred well before 1997, and knowledge of the electricians at Eaton was a critical issue during the trial. Further, Eaton's case-in-chief relied largely on the claim that all of its employees, many of whom worked for Eaton for a long time, were trained properly and safety was a continuous concern. Therefore, Shockley's testimony was both relevant and material. In addition, the length of time between Shockley's employment at Eaton and the time of this accident did not negate the relevance of his testimony but rather went to the weight to be given such testimony by the jury, a matter thoroughly addressed by counsel for Eaton during its cross-examination of Shockley. Accordingly, Eaton's third and fourth assignments of error are overruled.
 First Assignment of Error of Maynard
The Trial Court Erred in Denying Plaintiff's Motion for Pre-Judgment Interest.
{¶ 28} In Maynard's first assignment of error, he maintains that the trial court erred in denying his motion for pre-judgment interest. The Revised Code allows for the recovery of interest from the date the cause of action accrued in cases involving tortious conduct that are not settled by agreement of the parties upon a motion by the prevailing party. R.C. 1343.03(C). However, in order to award this interest, the trial court is required to determine "at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." R.C. 1343.03(C).
{¶ 29} The Ohio Supreme Court has held that "[t]he purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy." Peyko v. Federick (1986),25 Ohio St.3d 164, 167. Further, the Court has stated that "[t]he statute was enacted to promote settlement efforts, to prevent parties who have engaged in tortious conduct from frivolously delaying the ultimate resolution of cases, and to encourage good faith efforts to settle controversies outside a trial setting."Kalain v. Smith (1986), 25 Ohio St.3d 157, 159.
{¶ 30} In discussing R.C. 1343.03(C), the Ohio Supreme Court noted that the statute established "certain requirements."Moskovitz v. Mt. Sinai Medical Center (1994),69 Ohio St.3d 638, 658. "First, a party seeking interest must petition the court. The decision is one for the court — not any longer a jury. The motion must be filed after judgment and in no event later than fourteen days after entry of judgment." Id., citingCotterman v. Cleveland Elec. Illum. Co. (1987),34 Ohio St.3d 48, paragraph one of the syllabus. "Second, the trial court must hold a hearing on the motion. Third, to award prejudgment interest, the court must find that the party required to pay the judgment failed to make a good faith effort to settle and, fourth, the court must find that the party to whom the judgment is to be paid did not fail to make a good faith effort to settle the case." Moskovitz, 69 Ohio St.3d at 658, citing R.C.1343.03(C).
{¶ 31} The crux of an award of pre-judgment interest is the trial court's determination as to whether the party required to pay the money failed to make a good faith effort to settle the case with an opposing party who also did not fail to make a good faith effort to settle the case. If the court answers this question in the affirmative, R.C. 1343.03(C) requires the trial court to order the payment of pre-judgment interest. However, in determining the issue of lack of good faith, the trial court is afforded discretion. Moskovitz, 69 Ohio St.3d at 658. Thus, the trial court's decision in this regard will not be reversed absent an abuse of that discretion. In Moskovitz, the Ohio Supreme Court, in discussing one of its prior decisions, stated:
"A party has not `failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party. If a party has a good faith, objectively reasonable belief that he has no liability, he need not make a monetary settlement offer." While the last sentence in this syllabus has caused some difficulty we, nevertheless, reaffirm our holding with the caveat that the last sentence of the syllabus should be strictly construed so as to carry out the purposes of R.C. 1343.03(C).
Id. at 658-659, quoting Kalain, 25 Ohio St.3d at syllabus. In addition, the burden of proof of a lack of good faith is placed upon the party seeking the award of pre-judgment interest.
{¶ 32} Here, we note that the trial court did not conduct a hearing as required by R.C. 1343.03(C). However, for reasons unknown to this Court, at no point did counsel for Maynard request a hearing, protest the trial court's April 17, 2003 orders, wherein it indicated that it would proceed without an oral hearing, or even assert in its brief to this Court that the trial court erred in not conducting a hearing.[3] Thus, it appears that Maynard essentially waived a hearing on this motion and consented to the trial court's determination of the issue of pre-judgment interest based upon the submitted motion and response thereto, a practice we highly discourage litigants from engaging in given the discretion afforded a trial court in determining the issue of a lack of good faith. Furthermore, we question whether a party moving for pre-judgment interest can waive a hearing and still satisfy its burden of proof of a lack of good faith in the face of opposition to such motion. SeeGalmish v. Cicchini (2000), 90 Ohio St.3d 22, 33-34. Even so, we proceed to discuss the trial court's decision not to award pre-judgment interest.
{¶ 33} With regards to the filings of both parties, the two sides presented conflicting accounts of their conduct throughout this litigation, including variations regarding settlement negotiations and other matters outside of the record. Nevertheless, the trial court's July 23, 2003 judgment specifically states that it could "discern no evidence of badfaith negotiating on the Defendant's part thus rendering Plaintiff's Motion for Prejudgment Interest to be inappropriate[.]" (Emphasis added.) We find this determination to be in error.
{¶ 34} The Ohio Supreme Court has specifically noted that the standard for pre-judgment interest requires a finding of a lack of good faith by the party required to pay the judgment, not a finding that this party acted in bad faith. Moskovitz,69 Ohio St.3d at 659. The Court additionally cautioned that "[l]ack of good faith effort to settle should not be confused with bad faith." Id. Particularly, the Court stated that "a party may have failed to make a good faith effort to settle even though he or she did not act in bad faith." Id. "Bad faith has been defined as `a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" Hoskins v. Aetna Life Ins.Co. (1983), 6 Ohio St.3d 272, 276, quoting Slater v. MotoristsMut. Ins. Co. (1962), 174 Ohio St. 148, paragraph two of the syllabus. This definition is very different from the standard employed in determining a lack of good faith, as previously noted.
{¶ 35} Accordingly, due to the trial court's utilization of the incorrect test of "bad faith," we must necessarily reverse and remand on this issue. Further, in order for Maynard to meet his burden and for the trial court to adequately make its determination, we note that a hearing is required and is necessary in this case, given the conflicting assertions between the parties. Therefore, Maynard's first assignment of error is sustained.
 Second Assignment of Error of Maynard
The Trial Court Erred in Denying Plaintiff's Motion for Attorney's Fees.
{¶ 36} Maynard next asserts that the trial court erred in overruling his motion for attorney fees. In response, Eaton asserts, and the trial court agreed, that Maynard was required to raise the issue of attorney fees at trial and that this failure precluded any such award. For the reasons that follow, we disagree with Eaton.
{¶ 37} Ohio law provides that when punitive damages are proper, an aggrieved party may also recover reasonable attorney fees.Columbus Finance, Inc. v. Howard (1975), 42 Ohio St.2d 178,183. The Ohio Supreme Court has determined "that a litigant does not have a right to trial by jury to determine the amount of attorney fees." Zoppo v. Homestead Ins. Co. (1994),71 Ohio St.3d 552, 557, citing Digital Analog Design Corp. v. N.Supply Co. (1992), 63 Ohio St.3d 657. In addition, in Zoppo,
the Court specifically rejected its previous determination inDigital, that a trial court must submit to a jury the issue of whether attorney fees should be awarded in a tort action.Zoppo, 71 Ohio St.3d at 557, citing Digital,63 Ohio St.3d at 663. Thus, although submitting the issue to a jury of whether attorney fees should be awarded and the dollar amount of such award is a permissible action by the trial court, Villella v.Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 41; Digital,63 Ohio St.3d at 665, neither party is entitled to have the issue determined by a jury, Zoppo, 71 Ohio St.3d at 557.
{¶ 38} If the court does permit the jury to consider whether attorney fees should be awarded and the amount thereof, "there must be evidence presented at trial concerning the proper measure of attorney fees in order to allow an award." Villella,45 Ohio St.3d at 41. When a trial court does not submit the issue to the jury but the jury "has properly awarded punitive damages in a tort case involving fraud, insult or malice, a collateral or supplemental hearing should thereafter be conducted before the trial judge wherein the issue of reasonable attorney fees may be considered." Davis v. Owen (1985), 26 Ohio App.3d 62, 64. During this hearing, "the trial judge is charged with determining, first, whether attorney fees are warranted and, if so, the reasonable value thereof." Id.
{¶ 39} In this case, the trial court determined that an instruction as to punitive damages was warranted, and in its verdict, the jury awarded punitive damages to Maynard. Due to the award of punitive damages, the jury could have awarded reasonable attorney fees. However, during the trial, neither party requested that the issue of attorney fees be decided by the jury. Thus, evidence regarding attorney fees was not provided, and the jury was never instructed that it could award attorney fees to Maynard. Rather, Maynard filed a motion with the trial court shortly after the trial to recover attorney fees.
{¶ 40} As previously discussed, this motion was appropriate, and the trial court should have proceeded to conduct an evidentiary hearing. However, the trial court determined that Maynard improperly failed to address this issue with the jury, and as such, waived this matter. In so doing, the trial court erred. Therefore, the second assignment of error is sustained and the matter reversed as to this issue and remanded for the trial court to determine whether attorney fees are warranted, and if so, the reasonable value thereof in accordance with the factors established by the Ohio Supreme Court in Villella. SeeVillella, 45 Ohio St.3d at 41.
 Third Assignment of Error of Maynard
The Trial Court Committed Prejudicial Error against the Plaintiff by Excluding Plaintiff's Exhibit 34 and the testimony of Terry Bostick.
{¶ 41} Maynard's final assignment of error addresses matters to be considered in the event that we reversed the decision of the trial court regarding the jury verdict based on Eaton's assignment(s) of error. The Revised Code permits an appellee to file a cross-assignment of error in the interest of preventing a reversal. R.C. 2505.22; Morgan v. City of Cincinnati (1986),25 Ohio St.3d 285, 290. However, we are permitted to consider the cross-assignment of error only when necessary to prevent a reversal. Duracote Corp. v. Goodyear Tire Rubber Co. (1983),2 Ohio St.3d 160, 163, citing Parton v. Weilnau (1959),169 Ohio St. 145, 171. Here, our determination as to Eaton's four assignments of error renders our consideration of Maynard's third assignment of error unnecessary. Accordingly, this assignment of error is overruled.
{¶ 42} In sum, for the aforementioned reasons, all four of Eaton's assignments of error are overruled, as is Maynard's third assignment of error. However, Maynard's first two assignments of error regarding pre-judgment interest and attorney fees are sustained. Therefore, the judgment of the Common Pleas Court of Marion County, Ohio, is affirmed in part, reversed in part, and the cause remanded for further proceedings in accordance with law.
Judgment affirmed in part, reversed in part, and the causeremanded.
Bryant, J., concurs.
[1] Sometime in 1998, Eaton changed ownership of the Marion forging plant to Dana Corporation. However, at the time of the trial, Sypris Technology owned the plant.
[2] Although some witnesses reported two explosions, this inaccuracy is not relevant to the matters raised in this appeal.
[3] Notably, the issue of the necessity of a hearing was first addressed by Eaton in its memorandum contra to Maynard's motion for pre-judgment interest. In that memorandum contra, Eaton referenced the requirements of R.C. 1343.03(C) as delineated byMoskovitz, but took no position on this issue. In response to this reference, counsel for Maynard simply indicated that they would "be prepared for a hearing on this issue." However, a hearing was not requested, and the parties proceeded without one.