[Cite as *Daddario v. Rose*, 2024-Ohio-5883.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| COLLEEN O. DADDARIO, et al. | JUDGES:<br>Hon. John W. Wise, J. |
| Plaintiffs-Appellants | Hon. W. Scott Gwin, P. J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| | Case No. 2024 CA 00038 |
| MARYBETH O'HEARN ROSE | |
| Defendant-Appellee | O P I N I O N |


CHARACTER OF PROCEEDING:     Civil Appeal from the Courtof Common
                             Pleas, Probate Division, Case No. 237211

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      December 16, 2024

APPEARANCES:

For Plaintiffs-Appellants              For Defendant-Appellee

WILLIAM J. STAVOLE                     LAURA L. MILLS
H. WILLIAM BESETH III                  PIERCE C. WALKER
MELISSA Z. KELLY                       MILLS, MILLS, FIELY
TUCKER ELLIS LLP                       & LUCAS, LLC
950 Main Street, Suite 1100            101 Central Plaza South, Suite 1200
Cleveland, Ohio  44113                 Canton, Ohio  44702

BRIAN C. LAYMAN
LAYMAN LAW GROUP, LLC
4881 Munson Street, NW, Suite 301
Canton, Ohio  44718

DAVID DINGWELL
200 Market Avenue North, Suite 300
Canton, Ohio  44702

*Wise, J.*

**{¶1}** Appellants-Plaintiffs, Colleen Daddario, Timothy J. O'Hearn and Victoria O'Hearn, as Executrix of the Estate of Jeffrey O'Hearn ("Plaintiffs Appellants-Siblings") appeal the November 3, 2023 judgment entry of the Stark County Court of Common Pleas, Probate Division denying them punitive damages against Appellee-Defendant, Marybeth O'Hearn Rose.

### FACTS AND PROCEDURAL HISTORY

*The O'Hearn Trusts*

**{¶2}** Kathleen and Arthur O'Hearn lived in Stark County, Ohio and had four children, Colleen, Timothy, Jeffrey and Marybeth. During their lives, they worked hard, were successful in many businesses and owned A-1 Realty. They built and owned commercial apartment buildings on the corner of Whipple and Munson in Canton, Ohio known as the Whipple Avenue property. (Tr. I, 15). Their assets totaled over two million dollars. (Tr. II, 237.)[1]

**{¶3}** Kathleen O'Hearn and Arthur O'Hearn each executed a trust on December 4, 1991. Their four children, Colleen, Timothy, Jeffrey and Marybeth were named as remainder beneficiaries. Arthur died on February 25, 2011 and his wife, Kathleen, became the successor trustee of his trust. Kathleen was also the trustee of her own trust.

**{¶4}** The four siblings were treated as equal beneficiaries by both Arthur and Kathleen's trusts with one exception. Arthur, prior to his death, executed an amendment

---

[1] The videoconference trial held on July 15, 2021 will be referred to as Tr. I and II _____

to his trust that provided that if Kathleen predeceased Arthur, then upon Arthur's death, the Edward Jones account would be distributed only to Marybeth.

**{¶5}** Kathleen's daughter, Marybeth, was the only child still living in Stark County. Timothy lived near Cleveland, Jeffrey lived in Cincinnati and Colleen lived in Chagrin Falls.[2]

**{¶6}** On December 21, 2011, Kathleen amended her trust and appointed her daughter, Marybeth as co-trustee of her trust and to serve as executrix of her estate. Kathleen maintained the distribution of the trust remainder as equal to her four children but added for her grandchildren to be provided for from the trust as each of her four children deemed appropriate. "It is my desire that the named beneficiaries Jeffrey A. O'Hearn, Timothy J. O'Hearn, Marybeth O'Hearn Rose, and Colleen A. Daddario provide from their respective shares for distributions to my grandchildren, in such amounts as they deem appropriate."

**{¶7}** In short, both Arthur and Kathleen expressed their intention in their trusts that all four of their children share equally in the wealth they had accumulated upon their passing with exceptions as noted above for the grandchildren and Edward Jones account to Marybeth.

*Shelter Plan*

**{¶8}** After Arthur's death, Kathleen was diagnosed with Parkinson's disease. As a result, there was some talk of her admission to a skilled nursing or assisted living facility.

---

[2] Jeffrey O'Hearn died during litigation in this matter and his estate was substituted as a plaintiff.

Two doctors suggested that she plan on residing in a nursing home. Kathleen signed a contract with one, the Alsatian in Louisville, Ohio. But Kathleen had second thoughts.

{¶9} Kathleen wished to remain in her home, and her daughter Marybeth moved in with her for a time and became her primary caretaker from 2013 until her death on April 9, 2018. Caretakers were hired to assist with Kathleen's care, drive her to doctor's appointments, do her housekeeping, keep her company and ensure that she ate, as she was becoming increasingly depressed after her husband's death and her Parkinson's diagnosis became worse.

{¶10} Kathleen sought the advice of Margaret Kreiner, an attorney who held herself out as an elder law and estate planning attorney. An appointment was made for Kathleen to consult with Attorney Kreiner.

{¶11} Kathleen arrived at the office consultation with Marybeth and Todd Bosley, Marybeth's business partner.

{¶12} Marybeth and Todd Bosley sat in on the office conference with Attorney Kreiner and Kathleen.

{¶13} Attorney Kreiner made a list of all of Kathleen's assets and noted that they were substantial – almost 1.8 million - and that didn't include the assets in her late husband's trust. Tr. 1, 191.

{¶14} Attorney Kreiner devised a plan to shelter Kathleen's funds in the event she entered a nursing home facility. The plan was detailed in a letter Attorney Kreiner sent to Kathleen dated April 18, 2012. Bosley and Marybeth were sent a copy. The plan included the transfer of Kathleen's assets into the name of Marybeth for the purpose of protecting her assets and avoiding probate. The plan also included an update of a durable power

of attorney. Attorney Kreiner drafted a power of attorney and Kathleen signed it naming Marybeth as her agent.

{¶15} Attorney Kreiner also drafted a limited warranty deed which Kathleen signed transferring the Barnhill residence to Marybeth. A transfer on death affidavit was then prepared for Marybeth to sign naming Colleen as the sole transfer on death beneficiary. Tr. I, 183. The documents were signed by Kathleen and Marybeth and recorded with the Stark County Recorder.  An oil and gas lease transfer was also prepared transferring Kathleen's interests to Marybeth.

{¶16} Attorney Kreiner prepared no other documents transferring assets from Kathleen to Marybeth.  Kathleen never asked Attorney Kreiner to change her trust.  Tr. I, 182.

{¶17} Attorney Kreiner had no knowledge of the transfers of any other assets from Kathleen, Kathleen's trust or Arthur's trust to Marybeth until April of 2021.  Tr. I, 184.

{¶18} Attorney Kreiner saw Kathleen approximately four or five times.  During those meetings, she didn't believe she advised her to file gift tax returns on any gifts to Marybeth because she didn't know she was "doing gifting."  Tr. I, 211.  Attorney Kreiner prepared no gift tax return for the Barnhill property transferred to Marybeth.  Tr. I, 185.

{¶19} Following the death of Kathleen, Attorney Kreiner represented Marybeth in certain probate court proceedings involving the administration of Kathleen's estate.  Tr. I, 229.

*Assets transferred to Marybeth's name.*

**{¶20}** Following the letter from Attorney Kreiner, certain assets belonging to Kathleen were transferred to Marybeth's name, including the following transfers.

1.  PNC Bank account with funds in the amount of $54,068.65 held jointly by Kathleen and Marybeth to solely in Marybeth's name.

2.  Huntington Bank accounts with funds in the amount of $275,157.74 from Kathleen's trust to solely in Marybeth's name.  Colleen was listed as the transfer on death beneficiary until 2018 when Marybeth changed the beneficiaries to her two daughters.

3.  American Century Investments account with funds in the amount of $25,151.72 from Arthur's trust to solely into Marybeth's name.

4.  Real estate known as the Barnhill Property transferred by limited warranty deed from Kathleen to Marybeth.  Kathleen's daughter, Colleen, was listed as the transfer on death beneficiary.  Following the death of Kathleen, Marybeth sold the residence and retained the proceeds.

5.  Whipple Road funds owned jointly in Arthur and Kathleen's trust for a mortgage payoff in the amount of $333,952.00 transferred directly to an account solely in Marybeth's name.  This property had been sold to Property Alliance Group (PAG), a real estate entity owned by Marybeth and Todd Bosley prior to Kathleen's death.

6.  Edward Jones account with funds in the amount of $141,782.05 transferred by Kathleen to Marybeth.

7.  Mineral rights interest from Arthur's Trust to Kathleen's Trust; then transferred from Kathleen's Trust to Marybeth.

**{¶21}** The transfers took place over several months from 2012 to 2015 and were in an amount in excess of one million dollars.  Several documents and notes confirm that Kathleen's intent was to implement a shelter plan and maintain ownership and control of the assets for her benefit and needs even after the transfers occurred.  The exception was the Edward Jones account which she wrote was intended for Marybeth and the PNC account that Kathleen intended to gift to Marybeth for help she had given her.

*August, 2013 Email from Marybeth to her siblings*

**{¶22}** When a question was raised by one of Kathleen's siblings regarding Kathleen's assets, Marybeth wrote the following email to all of her siblings, Colleen, Jeffrey and Timothy:

Margaret Kreiner is a respected attorney who specializes in Elder Law and Estate Planning.  My objective was to preserve as much of her estate as possible so that she could have the resources to live where she wanted, (home) as long as it was safe, and perhaps have assets left over for her to do what she desired (hair appointments, massages, gifts to grandkids, etc.) and $ to will to children/grandchildren/Parkinsons Research, whatever.

Kreiner advised a plan that moved Mom's assets out of her name in order to prevent the government/care agency/facility from taking all the assets that belong to mom.  Most of the money and the house have been transferred out of Mom's name and into my name.  It has been a loooong,

slow emotional process, as end of life issues are very, very hard for mom to discuss.

Moving assets, for example, allows mom to access VA benefits to help offset the expense of in-home care should the need arise. Every single penny is accounted for and in the proper accounts to pass the scrutiny of the State and anyone else.

Mom's CPA is Tim Barta, of Smith, Barta and Co. on Hills and Dales Rd. He has also been overseeing things to make sure they are done properly. If I kick off before mom, all of mom's assets have been made POD to you 3, plus my estate, for my girls. Of course, that money is only to be used for care of mom and no other purpose until she passes, any remaining bills paid, then the balance divided among whomever/whatever she wishes.

The way it is set up, none of us should have to pay any money for her to receive quality care, so don't worry about that.

**{¶23}** (Pl.'s Trial Exh. 37)

**{¶24}** Following that detailed e-mail to Marybeth's siblings, Jeffrey O'Hearn wrote the following:

It seems to me that two questions are being asked.

At mom's death:

Will the proceeds from Whipple Road be included in mom's estate/will?

Will the proceeds from the sale of mom's house be included in mom's will and equitably distributed upon sale among the four of us?

Love,

Jeff

Marybeth replied:

Yes and yes

Love,

Marybeth

**{¶25}** (Pl.'s Trial Exh. 37).

*Kathleen's death on April 9, 2018*

**{¶26}** Kathleen died on April 9, 2018 survived by her four adult children and grandchildren. Marybeth sold the Barnhill property that her mother lived in and retained the assets. In June, 2018, two months after Kathleen died, Marybeth told her siblings, for the first time, that she intended to keep all of the moneys transferred into her name. When asked why she did not tell her siblings sooner that they would receive no moneys from the trust moneys transferred to her name, she explained that it wasn't her business to tell them. "Mom said she was going to tell them." Tr. I, 163. When the siblings were cleaning out the Barnhill residence, Marybeth informed her siblings that the assets belonging to Kathleen were her sole property; that their mother, Kathleen, had transferred the bulk of her assets to her [Marybeth] as a gift.

*Court gets involved*

**{¶27}** Various lawsuits ensued. On June 16, 2020, siblings Colleen, Timothy and Jeffrey filed a complaint against Marybeth claiming fifteen separate counts including constructive trust, unjust enrichment, conversion, accounting, breach of fiduciary duty, fraud and removal of Trustee.

**{¶28}** Marybeth was removed as a trustee and fiduciary and David Dingwell, was appointed successor fiduciary. He filed a suit against Marybeth claiming breach of fiduciary duty, concealment of assets, accounting, and declaratory judgment.

**{¶29}** The lawsuits were consolidated by the probate court.

*Bench trial held July 15, 2021*

**{¶30}** Following discovery and various pre-trial motions and summary judgments, a bench trial was held on July 15, 2021. Marybeth testified that her e-mail to her siblings was not true and that Kathleen had transferred the bulk of her assets to her as a gift.

*Trial Court issued Judgment Entry on September 23, 2021.*

**{¶31}** The trial court issued a judgment entry on September 23, 2021.

**{¶32}** The trial court found that five of the several transfers were not inter vivos gifts totaling $867,813.07. The trial court further found that the PNC and Edward Jones account transfers were valid gifts to Marybeth.

**{¶33}** The trial court also found in favor of Marybeth's siblings on their fraud and conversion claims, granted the request of Attorney Dingwell for declaratory judgment to return the assets to the trusts, and denied the request for a constructive trust. The trial court found in favor of Marybeth on the concealment claim. The court granted the appellees' motions for prejudgment interest and attorneys' fees. The court awarded $126,131.28 in pre-judgment interest to Attorney Dingwell.

**{¶34}** The moneys were placed in escrow pending appeal, and the issues of attorneys' fees and punitive damages were stayed.

*Appellate Court ruling – Daddario I*

**{¶35}** The Marybeth, filed an appeal with this court alleging four assignments of error. *Daddario v. Rose,* 2022-Ohio-3537 (5th Dist.). This Court denied assignment of error number one, found assignments of error numbers three and four premature and sustained her second assignment of error.

**{¶36}** This Court found that in determining the conveyance of inter vivos gifts, the trial court applied the wrong standard "clear and convincing evidence" instead of "preponderance of the evidence."

> In its judgment entry, the trial court examined each contested gift and determined whether appellant met her burden of proving an inter vivos gift by clear and convincing evidence. The trial court did not discuss the family gift presumption nor the undue influence presumption. Because appellant and her mother shared a fiduciary relationship, a presumption of undue influence arose as to all of the assets appellant alleges were conveyed as gifts, and appellant was required to rebut this presumption by a preponderance of the evidence.

**{¶37}**     *Id.* at ¶ 30

> . . . [T]he matter is remanded for a determination of whether appellant presented sufficient evidence to rebut the presumption of undue influence by a preponderance of the evidence and, if so determined, whether appellees presented clear and convincing evidence to rebut the family gift presumption.

**{¶38}**  *Id.* at ¶ 36.

*Remand to the Trial Court*

**{¶39}** On December 19, 2022, the trial court issued an Amended Judgment Entry pursuant to this Court's remand. The Entry consisted of twenty-three pages and contained findings of fact and conclusions of law.

**{¶40}** The trial court first determined that the "evidence and testimony presented at the hearing demonstrated each element of undue influence by a preponderance of the evidence. ...Therefore, Marybeth has failed to present evidence sufficient to rebut the presumption of undue influence by a preponderance of the evidence." *Judgment Entry, Dec. 19, 2022* at 9.

**{¶41}** Next, the trial court considered the family gift presumption. "However, assuming *arguendo* that Marybeth met her burden of rebutting a presumption of undue influence by a preponderance of the evidence, the burden would shift to Plaintiffs to rebut the family gift presumption by clear and convincing evidence." *Judgment Entry, Dec. 19, 2022* at 10. The trial court did an analysis of each of the transfers based on the testimony and exhibits produced at trial. The trial court found that evidence was sufficient to rebut the family gift presumption by clear and convincing evidence for five of the seven transfers of assets. With regard to the PNC account, it found that one-half belonged in Kathleen's Estate because Marybeth failed to rebut the presumption of undue influence.

**{¶42}** The trial court further found that the main source of evidence that Kathleen made an inter vivos gift of her assets to Marybeth was Marybeth's testimony. The trial court found that Marybeth's testimony was "wholly unreliable and unconvincing." "In conclusion, the Court has previously determined and continues to find that the transferred assets to Marybeth were not gifts." *Judgment Entry, Dec. 19, 2022* at 11.

**{¶43}** The trial court further found that Marybeth committed fraud when she misled her siblings in the August, 2013 email. "Finally, the Court finds that a resulting injury of being deprived of a rightful inheritance was proximately caused by the reliance... [T]he Court hereby enters judgment in favor of Plaintiff's on Counts VI and XIII." *Judgment Entry, Dec. 19, 2022* at 18.

**{¶44}** The trial court further entered judgment for plaintiffs on conversion and breach of fiduciary duty.[3]

**{¶45}** The trial court entered judgment for Marybeth on the concealment count and the constructive trust count. "While the Court has found in Plaintiffs' favor on the fraud claims, a constructive trust is not necessary as Kathleen's Trust, Arthur's Trust, and the estate of Kathleen all have the capacity to receive and distribute any misappropriated funds as ordered herein." *Judgment Entry, Dec. 19, 2022* at 22. The trial court also did not find any wrongful or culpable conduct on the part of Marybeth on the contents of the safe deposit box. "There was no finding of wrongful or culpable conduct on the part of Marybeth, which is an element of concealment. In this instance, the Court does not find that Marybeth acted with wrongful intent." *Judgment Entry, Dec. 19, 2022 at* 21.

*Hearing on August 25, 2023 on attorneys' fees,
punitive damages and prejudgment interest.*

**{¶46}** Following the issuance of the December, 2022 Amended Judgment Entry, the trial judge recused herself and a new visiting judge was assigned to preside over the case.

---

[3] A second appeal was filed by appellant in 2023 that was dismissed for lack of jurisdiction, 2023 CA 00012.

**{¶47}** The matter of attorneys' fees, prejudgment interest and punitive damages came on for hearing on August 25, 2023.

*Hearing on attorneys' fees*

**{¶48}** At a pretrial immediately preceding the hearing, Marybeth objected to the testimony of Attorney Charles Brown as an expert witness to testify on behalf of plaintiffs-appellants on attorneys' fees. In accordance with an agreed judgment entry, Marybeth received the name of Attorney Brown three days prior to the hearing, Tr. August 25, 2023 at 6.

**{¶49}** Marybeth alleged that Attorney Brown was an expert witness, and she did not receive a copy of his expert report and curriculum vitae in accordance with App.R. 27. The trial court overruled the objection saying:

> ...if he's not testifying as an expert and he's just testifying as to his
> lay opinion, we'll – we'll see what he has to say...[A]nd he's not going to be
> qualified as an expert, we'll just hear what he has to say. Okay. And then
> so I'm overruling the motion to exclude this person as a lay witness.

**{¶50}** Tr. August 25, 2023 at 12.

*{¶51}* The plaintiffs-appellants-siblings then presented the testimony of two attorneys who represented them, the testimony of Attorney Brown and the itemized invoices. Marybeth cross-examined all of the witnesses and presented no additional evidence.

*Punitive Damages*

**{¶52}** At the portion of the hearing on punitive damages, no testimony was presented as to award of punitive damages. The parties stipulated as to the evidence to

be considered for punitive damages, to wit, the trial transcripts, no previous deposition testimony not used at trial for impeachment, oral arguments, briefs and exhibits.

**{¶53}** In separate entries, the visiting judge awarded prejudgment interest to Attorney Dingwell, denied punitive damages to plaintiffs-appellants siblings and awarded attorneys' fees to plaintiffs-appellants siblings in the amount of $307,250.00. *Judgment Entries, Nov. 3, 2023, Jan. 8, 2024, Feb. 26, 2024.*

**{¶54}** This matter is now before the Court on the appeal of the plaintiffs-appellants siblings of the trial court's denial of punitive damages.

### ASSIGNMENTS OF ERROR

**{¶55}** "I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DENIED PLAINTIFF-APPELLANTS AN AWARD OF PUNITIVE DAMAGES BASED ON APPELLEE'S MALICE, ILL WILL, AND HER CONSCIOUS DISREGARD FOR APPELLANTS' RIGHTS UNDER THEIR PARENTS' TRUSTS THROUGH APPELLEE'S FRAUD AND CONVERSION OF TRUST ASSETS CAUSING APPELLANTS' SUBSTANTIAL HARM."

*I. Standard of Review*

**{¶56}** The standard of review in reviewing a decision of the Probate Court on whether to award punitive damages is abuse of discretion. Absent an abuse of discretion, the court's ruling will be upheld. *McHenry v. McHenry,* 2017-Ohio-1534, ¶ 72 (5th Dist.), citing *Kemp v. Kemp,* 2005-Ohio-3120, ¶ 73 (5th Dist.); *Greig v. Wallick,* 2012-Ohio-77, ¶ 86 (5th Dist.);

**{¶57}** Abuse of discretion is defined in *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219. (1983). "[I]n order to find an abuse of discretion, [the court] must determine that the

trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgement."

**{¶58}** As the *McHenry* court noted, under Ohio law, a finding of actual malice must be made before punitive damages can be awarded. "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."

**{¶59}** *Id.* at ¶ 73 citing *Preston v. Murty,* 32 Ohio St.3d 334 (1987), syllabus.

**{¶60}** In this case, appellants asked for punitive damages on their fraud and conversion claims. The issue of punitive damages was stayed while the matter was appealed to this Court. *Daddario v. Rose,* 2022-Ohio-3537 (5th Dist.). Upon remand, the presiding judge recused herself and a visiting judge was appointed to hear the issue of punitive damages, attorneys' fees, and prejudgment interest.

**{¶61}** On August 25, 2023, the matter was set for hearing. Three separate matters were scheduled that day – punitive damages, attorneys' fees, and prejudgment interest.

**{¶62}** At the hearing on punitive damages, no testimony was presented by either appellants or appellee. Instead, the appellants presented to the court the authority it relied on for an award of punitive damages and the parts of the zoom trial transcript held on July 15, 2021 they relied on to demonstrate punitive damages.

**{¶63}** The parties stipulated to the evidence to be considered for punitive damages – the zoom trial transcripts, oral arguments, briefs and exhibits. Tr. August 25, 2023 at 56.

**{¶64}** Depositions that were referenced at trial and used to impeach witnesses but depositions taken that were not used at the zoom trial would not be included in the items reviewed by the trial court.

**{¶65}** On November 3, 2023, the trial court entered an order denying punitive damages.

*{¶66}* "Additionally, having heard the evidence and having reviewed the written summations and arguments of the parties, the Court further overrules and denies the Plaintiffs' claim for punitive damages." *Judgment Entry, Nov. 3, 2023.*

**{¶67}** An award of punitive damages is not automatic when a trial court finds a fiduciary committed fraud and/or conversion. A finding of actual malice is required. *McHenry v. McHenry,* 2017-Ohio-1534 (5th Dist.) at ¶ 73, 74.

**{¶68}** While the judge who presided over the trial found that appellee committed fraud and conversion, she made no finding of actual malice based on appellee's conduct and the surrounding circumstances.

**{¶69}** The visiting judge, reviewing the record, the trial transcripts, and the arguments of counsel, declined to award punitive damages.

**{¶70}** We cannot find that the trial court abused its discretion. We do not find that the trial court's attitude was "unreasonable, arbitrary or unconscionable". *State v. Adams,* 62 Ohio St.2d 151, 149. Nor do we find that its decision exhibits a "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.,* 66

Ohio St.3d 619, 621 (1993). Review for an abuse of discretion does not permit a reviewing court to substitute its judgment for the trial court's judgment. The trial court was the finder of fact and competent and credible evidence in the record support its findings.

**{¶71}** While the trial court did not state its specific reasons for denying punitive damages, it stated that it did a review of the record, the transcript and the arguments of the parties. The evidence does not demonstrate that appellee willfully destroyed or disposed of any property she was ordered to return to the trusts and the estate. The moneys were deposited in an escrow account in the name of Attorney Dingwell. *See Petefish v Haselberger,* 2005-Ohio-5638, ¶ 34 (5th Dist.*)* (finding that punitive damages are properly awarded when trust property is willfully and intentionally disposed of or destroyed but excessive when missing property is valued and properly returned to trust); *Villella v. Waikem Motors, Inc.,* 45 Ohio St.3d 36 (1989) modified on other grounds, *Moscovitz v. Mt. Sinai,* 69 Ohio St.3d 638 (1994) ("The purpose of punitive damages is to punish and deter, but not to vanquish or annihilate the defendant." Justice Brown concurring).

**{¶72}** Even then, the trial court did not allow the appellee to skirt the litigation unscathed. As noted by appellant, the same judge that denied punitive damages ordered her to pay $307,250.00 to appellants for attorneys' fees and $135,264.89 in prejudgment interest for a total of $442,514.89. So, too, one-half of the PNC account totaling $54,068.65 that Kathleen intended to gift to appellee was returned to the Estate of Kathleen when the trial court found appellee failed to rebut the presumption of undue influence.

**{¶73}** In short, we do not find that the trial court abused its discretion in failing to award punitive damages and accordingly will not substitute our judgment for that of the trial court.

**{¶74}** Appellant's sole assignment of error is overruled.

## CONCLUSION

**{¶75}** For the foregoing reasons, the judgment of the Court of Common Pleas, Probate Division, Stark County, Ohio, is affirmed.

By: Wise, J.

Gwin, P. J., and

King, J., concur.

JWW/kt 1126